## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jimmy Morton, | Case No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Park Christian School, Christopher Nellermoe, Joshua Lee, and Timothy Kerr, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>INTRODUCTION</u>

1.     In the spring of 2015, Plaintiff Jimmy Morton ("Morton"), an eighteen-year-old from Jackson, Mississippi, moved across the country to Moorhead, Minnesota to attend Park Christian School ("PCS"). Morton, a talented athlete, skilled at both basketball and track, loved basketball and was drawn to PCS because of its excellent basketball program. The PCS community had high hopes for its varsity boys' basketball team's (the "PCS Team") upcoming season, which soon included Morton, and believed the boys had an excellent chance to make it to the state tournament.

2.     Shortly after arriving in the Fargo-Moorhead area, Morton met PCS Head Basketball Coach Joshua Lee ("Coach Lee") and was invited to join PCS's summer basketball program. Coach Lee gave Morton a PCS school uniform and put him on the roster. Coach Lee set a rigorous summer schedule, with early morning practice five days a week at the PCS gym, followed by an hour of weight-lifting, presided over by PCS Assistant Varsity Football Coach and Summer Weight Room Coach Andy Doll ("Coach Doll"). Morton attended every practice and did everything his coaches asked of him. On the weekends, Morton and his PCS teammates scrimmaged other high school

1

teams. The PCS Team also played in a league on Tuesday nights, which was coached by Coach Lee.

3.      Shortly after joining the PCS team, Morton learned that they were expected to participate in a high school boys basketball tournament in Wisconsin Dells in late June, known as the High School Boys Basketball Shoot Out in the Dells (the "High School Shootout"). Morton was told Coach Lee or PCS Head Football Coach Tim Kerr ("Coach Kerr") would use school vans to transport the team, which Morton explained to his mother, who was still in Mississippi.

4.      On the morning of June 23, 2015, Morton and seven other teammates arrived at the PCS parking lot to depart for Wisconsin. Morton got a ride to PCS from a family friend, Raymond Kvalvog. Mr. Kvalvog's two sons, eighteen-year-old Zachary Kvalvog ("Zach") and fourteen-year-old Connor Kvalvog ("Connor"), were also on the varsity team and had driven to PCS separately in Mr. Kvalvog's pickup truck. Contrary to what Coach Lee had told the team, there was no school van. Apparently, PCS Principal Chris Nellermoe ("Principal Nellermoe") had refused Coach Lee's request for school transportation, a violation of PCS policy, which mandates that, "High school students and coaches will travel to and from the game by school transportation as provided."

5.      Instead of canceling the trip, the coaches decided to drive their own vehicles. Coach Kerr planned to drive his vehicle and transport four players. But Coach Lee refused to transport the other players even though there were four open seats in his car. Consequently, the coaches decided that Zach would have to drive Connor, Morton, and seventeen-year-old Mark Schwandt ("Schwandt") in Mr. Kvalvog's truck. This was a clear violation of PCS school policy which strictly forbids players from driving their own vehicles to out-of-town events, a policy intended to keep players safe.

2

6.      Mr. Kvalvog tried to intervene and asked several adults to drive the boys in Mr. Kvalvog's truck, including Coach Lee. Coach Lee refused and responded that he had to pick up his wife in Minneapolis. Mr. Kvalvog then suggested to Coach Lee that he at least give Morton a ride since he was new to Fargo-Moorhead and PCS. Coach Lee hesitated and told Mr. Kvalvog that it would be "uncomfortable" to have Morton in the car. When Mr. Kvalvog asked why, Coach Lee made an explicitly racist remark regarding Morton. Kvalvog was so shocked by Coach Lee's remark that he did not press the issue further.

7.      Before leaving the school parking lot, the coaches told Zach to stay together on the road. The PCS Team departed in a three-vehicle caravan, led by Coach Kerr. Coach Lee was second in line and drove alone. Zach, transporting Connor, Schwandt, and Morton, trailed behind. Just before the caravan left Moorhead, Coach Lee called Zach on his cell phone and again told him to stay together on the trip. Traveling eastbound on I-94, Coaches Kerr and Lee proceeded to drive in excess of the posted speed limit of 55 and 70 miles per hour.

8.      There were no games that day. They did not need to rush. But the coaches, who instructed Zach to keep up with them, drove on average, more than 80 miles per hour. Just outside of Dalton, Minnesota, Coach Kerr passed a semi driving in the right lane. Coach Lee also passed the semi. But when Zach attempted to pass, the semi encroached into Zach's lane. Zach veered to the left to avoid a crash, but as a teenage driver with only two years' experience, and traveling at 80 miles per hour, he lost control of the truck, which spiraled violently out of control, rolling over and landing in the westbound lane of I-94.

9.      Zach was killed. Connor and Morton were both thrown from the truck, landing in the westbound lane of the interstate. Several people came upon the horrific crash and stopped to help. Deb Van tried to talk to Morton but he was confused, screaming in pain and his words were

3

unintelligible. Another woman gave Morton a blanket and he finally leaned against Ms. Van's car. Morton was air-lifted to Sanford's Emergency Department in Fargo. Morton suffered a traumatic brain injury and most of the skin was torn off his back. Connor died on the highway a short time after the crash. Schwandt was also injured, but survived.

10.    Coach Kerr and Coach Lee did nothing, absolutely nothing, to help their players after the crash. Coach Lee did not slam on his brakes and run to the boys' sides. According to witness testimony, Coach Lee did not even arrive at the scene right away, despite his statement to authorities that he witnessed the crash in his rear view mirror. For his part, Coach Kerr continued to drive for several miles, passing six emergency turn-arounds, before returning to the crash site, even though Coach Lee had called him to report that the Kvalvog boys were dead.

11.    Coach Lee was trained in first aid and had a PCS first aid kit with him. But Coach Lee, the leader of this event, did nothing to help his dead, dying or injured players' aid. Instead, he spent the entire time on his phone. Coach Lee's phone records establish that he made and received thirteen calls to school officials and others after the accident, but not a single call to 911. Coach Lee was apparently most concerned with protecting himself and the school from liability. Indeed, within a couple hours of the horrific crash, a pastor from one of PCS's sponsoring churches, emailed his parishioners about the accident attempting to distance the school from the event and insulate it from liability: "The boys were heading to participate in a basketball tournament in Wisconsin when the accident occurred. *Although the trip was not sponsored by Park Christian*, some on the trip, including the Kvalvog boys were students at Park."

12.    PCS coaches did not protect their players, but they made every effort to protect themselves. Both Coach Kerr and Coach Lee lied about their involvement in the accident and its aftermath. Coach Kerr made the incredible claim, under oath, that his cruise control was set between

73 to 74 miles per hour, which was a mathematical impossibility given that the caravan traveled 65 miles in about 48 minutes. Coach Lee – who was *following* Coach Kerr – admitted to driving at least 75-80 miles per hour. Coach Lee initially lied about the involvement of the semi and claimed that Zach had simply driven off the road, preventing Morton and the others from locating the semi-driver. Moreover, Coach Lee lied about his response to the crash, falsely claiming under oath that he went to his injured players to offer them aid and comfort. In fact, eyewitnesses confirmed that Coach Lee did not go the boys and never got off his phone.

13.     PCS owed both a duty of care and a fiduciary duty to Morton, which it violated in every conceivable way. First, none of this would have happened if PCS had just followed its own rules. Principal Nellermoe violated PCS policy by refusing to provide school vans. Without school transportation, Coaches Lee and Kerr should have canceled the trip. Instead, they both violated PCS policy which strictly forbids students from driving to out-of-town events, without exception. PCS also violated Minnesota State High School League ("MSHSL") rules by influencing Morton and others to participate in rigorous summer practice and attend the High School Shootout. Moreover, Morton was on the road that day because of PCS. The tournament was promoted and pushed by Coach Lee, who made all the arrangements, except for transportation. After violating PCS policy and MSHSL rules, Coaches Lee and Kerr told Zach to stay together on the road, and then proceeded to violate the law by leading Morton and his teammates on an 80-mile-per-hour trek across the state, which ended in disaster. The coaches continued to violate their duties to Morton by failing to come to his aid as he screamed in pain from his injuries.

14.     Morton's injuries derailed his prospective athletic career. Prior to the accident, Morton jumped seven feet, two and quarter inches in the high jump, which is comparable to recent Olympic medal recipients. Consequently, several Division One colleges were recruiting him after

his junior year. He was also an excellent basketball player, with a promising future in college basketball and beyond. The egregious conduct of PCS changed all that for Morton. Morton continues to suffer from the traumatic brain injury and has been permanently disfigured. The accident has changed his brain functioning and the course of his life. None of this would have happened if PCS had followed its own rules. But it didn't and Morton has never been the same since.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), as the parties are completely diverse and the amount in controversy exceeds $75,000.

16.    Venue is proper in the United States District Court, District of Minnesota pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred in the State of Minnesota.

## PARTIES

17.    Plaintiff Jimmy Morton is an individual residing in West Fargo, North Dakota.

18.    Defendant Park Christian School ("PSC") is a private Evangelical Christian K-12 school in Moorhead, Minnesota. PCS is a non-profit corporation registered to do business in the State of Minnesota.

19.    Defendant Christopher Nellermoe is an individual residing in Moorhead, Minnesota.

20.    Defendant Joshua Michael Lee is an individual residing in Apple Valley, Minnesota.

21.    Defendant Timothy Kerr is an individual residing in Wichita, Kansas.

## FACTS

### Morton joins the PCS Boys' Basketball Team

22.     In late May 2015, eighteen-year-old Morton moved from Jackson, Mississippi to West Fargo, North Dakota. Morton had cousins from West Fargo, who told him the Kvalvog boys were the best athletes in the area. Morton was also a very talented athlete, skilled at basketball and track and had previously jumped seven feet, two and quarter inches in the high jump. Morton hoped to build on that success and thought that by playing with the Kvalvog boys at PCS, he would gain more visibility in sports to improve his chances of being recruited by a Division One college and beyond. Morton intended to play basketball at PCS and to join the track and field team. The plan was for Morton to stay with his relatives in West Fargo, until his mother joined him there in June.

23.     Basketball is a sanctioned extra-curricular activity at PCS. PCS assumed supervision and control of the PCS Team during the summer. Coach Lee established a summer practice schedule and practices were held at PCS. Players were expected to attend.

24.     Shortly after arriving in Fargo, Morton was invited to practice with the PCS Team in preparation for the upcoming school season. The team needed an athletic power forward to fill out the starting lineup and Morton fit the bill. Coach Lee gave him a PCS uniform and put him on the roster. Morton attended every practice five days per week under Coach Lee's direction and all team meetings. Morton lifted weights each day after practice under the supervision of Coach Doll. On weekends, Morton and his teammates scrimmaged other teams at Minnesota State University Moorhead. Morton also played in a Tuesday night basketball league coached by Coach Lee. PCS Team practice sessions were for PCS students only. Morton was invited to participate in PCS Team practice sessions because he intended to enroll and attend school there in the fall.  PCS knew that

Morton intended to enroll and attend the school.  For all intents and purposes, PCS treated Morton as a PCS student and a member of the PCS Team.

25.     Morton put his trust and confidence in PCS and its officials, who had an influence on the teenager, an influence that they encouraged. PCS effectively took Morton under its wing. Several coaches and administrators at PCS took an immediate interest in Morton and his athletic ability. In addition to Coach Lee, Morton met PCS Activities Director Richelle Richardson ("AD Richardson") who welcomed Morton to PCS. AD Richardson told Morton that he would be an excellent addition to all their sports programs. Coach Kerr recruited Morton to go out for the football team, so he also began participating in Wednesday night PCS football practices. Principal Nellermoe asked Morton about his grades, apparently to make sure Morton would be eligible to play sports during PCS's regular season. Both Principal Nellermoe and PCS President Kent Hannestad watched the basketball team practice. PCS Development Director Austen Schauer also welcomed Morton to the school, watched him practice and was helping Morton's mother, Sondra Turner, with the enrollment process at PCS. Morton was introduced to former PCS Coach and NBA player Erv Inniger, who gave him pointers on his game. PCS had high hopes for the boys' basketball team. The PCS Team had made it to the state tournament in 2014 and several of those players would be returning for the upcoming season. With Morton rounding out their team, many in the PCS community believed they had a shot at the state title.

**The High School Shootout**

26.     After arriving at PCS, Morton soon learned that the PCS basketball team was expected to participate in the High School Shootout in Wisconsin. The PCS Team had a big season ahead, and Coach Lee wanted his players to attend the tournament so they could compete against other high school teams. The tournament was a big deal for PCS and players knew that if

they didn't participate, it would adversely affect their playing time during the regular season. Coach Lee told the players at a team meeting that coaches would drive the players in school vans. Morton, who saw Coach Lee as his leader and mentor, knew that if he wanted to be part of the starting lineup in the winter, he had better attend the tournament. Morton told his mother about the High School Shootout and, knowing that her son would be transported by coaches in school vans, she agreed. Coach Lee gave Morton a PCS travel polo and shorts, and told the players to wear their PCS travel uniform on the trip to Wisconsin. PCS paid for both Morton's travel and game uniforms. PCS employees encouraged Morton to attend the High School Shootout and it was understood that he would. On more than one occasion, Principal Nellermoe wished Morton "good luck in Wisconsin!"

27.     Plans for PCS to participate in the tournament had been in the works for months. Coach Lee received an email invitation on March 25, 2015, which stated, "Our Events are High School Teams ONLY (NO CLUB TEAMS!)."  PCS employees soon began promoting the High School Shootout. The April 2015 edition of the Falcon Flyer, PCS's school newsletter, touted the "Boys' Basketball Camp [scheduled for] June 22-25. Watch for registration details." An email "Weekly Update" to parents dated April 13, 2015, also included a "Save the Date" for a Boys Basketball Camp on June 22-25. Parents were told to "Watch for registration details." According to PCS, "The Weekly Update is a sample of *all that is happening at Park Christian School.* All dates and times are subject to change. Please visit our website to stay current on all that is scheduled!" Players also learned about the tournament from Coach Lee and AD Richardson.

28.     On April 20, 2015, Coach Lee filled out a PCS purchase voucher requesting payment from the school for the tournament registration fee in the amount of $395. The request was approved by AD Richardson. PCS personnel issued a check for the registration fee. Coach Lee filled out the

registration form, listing Park Christian School as the sponsoring school and its address. Finally, Coach Lee made the hotel reservations for the players. Morton did not pay for the registration fee or hotel. PCS covered all the expenses.

29.     During a team meeting in the spring, Coach Lee distributed a schedule to players entitled, "Summer Basketball 2015". The schedule outlined the PCS Team's summer practice schedule and listed a number of "Varsity Tournaments," in which the team would participate, including the High School Shootout.

**PCS violates Minnesota State High School League Rules**

30.     PCS is a member of the Minnesota State High School League ("MSHSL") and is subject to its rules, which are intended to protect students. For example, MSHSL Bylaws put limitations on summer practice sessions in order to protect students from being overworked during their summer vacation.

31.     The MSHSL Official Handbook provides in pertinent part:

**BYLAW 208.00   NON-SCHOOL COMPETITION AND TRAINING (TEAM AND INDIVIDUAL SPORTS)**

\*\*\*

3.   Summer Vacation Period:

    A.   Students *may participate* in camps, clinics/non-school teams, *provided that* these summer activities *are voluntary and they are not influenced or directed to participate by a salaried or non-salaried member* of *the* student's sophomore, B-squad, junior varsity or *varsity high school coaching staff in that sport*.

    B.   *A student may not use any type of high school uniform. . . .*

\*\*\*

4.   Summer Coaching Waiver:

    A.   *Member schools shall have the authority to approve a coaching waiver for their salaried and non-salaried coaches.* The summer

coaching waiver grants permission to high school coaches to coach and instruct members of the high school team during the summer waiver period. The summer waiver period begins on June 1 and concludes on July 31. . .

***

B.  Procedure for Granting Summer Coaching or Summer Camp/Clinic Waivers:

*The designated school representative of the member high school shall document, in writing and keep on file in the school*:

1)  *A letter of verification from the coach indicating an agreement to coach the students*;

2)  *The official League Summer Waiver Request. . . .*

32.   PCS violated MSHSL Bylaws in several ways. First, PCS never obtained a summer coaching waiver for the 2015 PCS Team summer practice schedule established by Coach Lee. Second, Coach Lee influenced or directed the players to participate in summer practices, in a rigorous schedule established by Coach Lee. Coaches Lee and Doll also influenced or directed the players to participate in weight training sessions following basketball practice. PCS coaches also influenced the players to attend the High School Shootout. For example, Zach wanted to attend an AAU tournament in St. Cloud, rather than the High School Shootout. But Coach Lee wanted his players to compete against other high school teams in preparation for their big upcoming season.

33.   Coach Lee pressured Zach to attend the tournament and told him that, as team captain, it was important that he attend. Indeed, Coach Lee gave Zach a memorandum outlining his responsibilities as team captain. In addition to "REPRESENTING Jesus Christ and PCS well[,]" Zach was expected to "[put] the team and the program before [him]self." Zach felt the pressure and decided to go on the trip. Another team member chose to go on a church youth group trip instead of the High School Shootout and knew there would be ramifications for not attending the tournament. Morton, like the other players, knew that he was expected to attend the tournament and

11

that if he didn't, his play time would be reduced during the regular basketball season. PCS also violated MSHSL Bylaws when Coach Lee instructed his players to wear their high school uniforms to the tournament.

**PCS violates its own policy**

34.     Coach Lee was in Hawaii for two weeks prior to the tournament. He emailed parents several days before the team was to depart, apologizing "for the lack of information/communication about the Wisconsin Dells Trip." He said, "As many of you know I have been out of town the last couple of weeks and now I have no access to my work email until Sunday night." Coach Lee continued:

> I will be at practice on Monday, the guys going on the trip will be staying for about an hour afterwards so that we can make sure we are ready and have everything for the trip needed from a basketball stand point. I will be giving them any and all final information during that time. Also during that time I will be collecting the waiver forms and money for the hotel (cash or check is fine) [checks made out to: PCS BBB- JOSH LEE]

35.     At the meeting, Coach Lee told his players to meet at the PCS parking lot the morning of June 23, 2015. The players were told to wear their traveling uniform – PCS polo shirts and shorts – and to bring their PCS varsity uniforms for the games. When Connor Kvalvog arrived that morning wearing Minnesota Gopher shorts, Coach Lee brought him into the school so he could change into a PCS traveling uniform. At the same time, Coach Lee gathered basketballs labeled "PCS" from a locker inside the school.

36.     On the morning of June 23, 2015, Ray Kvalvog picked up Morton and drove him to PCS. Morton soon learned that the team would not be traveling by school van. Although Coach Lee asked Principal Nellermoe for school vans, the principal refused.

37.     This was a clear violation of PCS policy, which mandates that, "High school students and coaches will travel to and from the game by school transportation as provided."

38.     Without school transportation, the coaches should have canceled the trip. They did not. Instead, the coaches planned to drive their own vehicles. Coach Kerr would drive his vehicle and transport four players, including his two sons. And although Coach Lee had four open seats in his car, he intended to drive alone because of his personal plans to pick up his wife in Minneapolis.

39.     The PCS Handbook does allow for non-school transportation to out-of-town events, but *only* if players "get written permission from their parent/guardian, coach, Activities Director and Principal in advance." The four players in Coach Kerr's vehicle, did not have such advance written permission from parents, coaches, or school officials as required.

40.     Because Coach Lee insisted on driving alone, the coaches decided that the only solution was to have teenaged Zach drive three other teenagers, Connor, Morton, and Schwandt, in Mr. Kvalvog's truck.

41.     Uncomfortable with this plan, Mr. Kvalvog tried to enlist other adults to drive, including Coach Kerr's wife, Dawn. Mr. Kvalvog asked Coach Kerr if he would drive the boys in Zach's truck and Dawn could drive the other four players in the Kerrs' vehicle. Coach Kerr declined and said his wife would be uneasy about driving the long distance to Minneapolis and beyond. Mr. Kvalvog went into the school and asked Coach Doll if he would drive. Coach Doll refused. Mr. Kvalvog also asked Coach Lee to drive the boys in his truck, but Coach Lee refused and responded that he had to pick up his wife in Minneapolis. Mr. Kvalvog then suggested to Coach Lee that he at least give Morton a ride since he was new to Fargo-Moorhead and PCS. Coach Lee hesitated and told Mr. Kvalvog that it would be "uncomfortable" to have Morton in the car. When Mr. Kvalvog asked why, Coach Lee made an explicitly racist remark regarding Morton. Mr. Kvalvog was so shocked by Coach Lee's remark that he did not press the issue further.

42.     The coaches' decision to have Zach drive was a violation of PCS policy which only permits players to take non-school transportation to out-of-town events if players "get written permission from their parent/guardian, coach, Activities Director and Principal in advance." Like the players in Coach Kerr's car, neither Zach, Connor, Schwandt or Morton had such written permission to take non-school transportation. But more importantly, the coaches' decision to have Zach drive was also a clear violation of another PCS school policy which strictly forbids players from driving their own vehicles to out-of-town events. The Park Christian Handbook mandates, "No students will drive their own cars from school to an out of town meet or event." There are no exceptions to this rule. Consequently, even if the players riding with Zach had obtained written permission from their parents, coaches and school officials, the plan was nonetheless forbidden because of this policy.

43.     Principal Nellermoe, AD Richardson and Coach Doll were all present at the school that morning. Like Coaches Kerr and Lee, they all knew about the trip. But not a single one of them stepped in to put a stop to a teenager driving three other teenagers hundreds of miles across the state in violation of PCS policies.

44.     Morton's mother was scheduled to fly into Fargo on June 24, to formally enroll her son at PCS and arrange for work and housing.  Ms. Turner understood that the coaches would drive her son to the tournament using school vans. Had she known about this senseless plan, she would never have allowed her son to go on the trip in the first place. But she did not know, so she could not stop it.

45.     Before leaving the school parking lot, the coaches told Zach to keep up with them on the road. The PCS Boys Basketball Team departed in a three-vehicle caravan, led by Coach Kerr. Coach Lee was second in line and drove alone. Zach, transporting Connor, Schwandt, and

Morton, trailed behind. The coaches did not instruct Zach to stay in the middle of the caravan so they could both keep an eye on the boys. In fact, the coaches did not even discuss the possibility that Zach should remain in the middle for the sake of safety.

46.     Shortly after leaving the PCS parking lot, Coach Lee called Zach on his cell phone. Coach Lee told Zach to call him if the boys wanted to stop because Coach Lee wanted the caravan to stay together on the road.

47.     Notably, Coach Lee did not give Zach any other instructions such as "buckle up," "don't speed," "don't text and drive," or "don't use your phone." In fact, the only instruction he gave Zach was, in fact, for him to use his phone while driving to call Coach Lee if the boys wanted to stop.

48.     Traveling eastbound on I-94, Coaches Kerr and Lee proceeded to drive far in excess of the posted speed limit, which varied between 55 and 70 miles per hour. In so doing, Coaches Kerr and Lee violated the law. The caravan traveled 65 miles in approximately 48 minutes. There were no games that day. They did not need to rush. But the coaches drove, on average, more than 80 miles per hour. According to Coach Lee, he never thought "I've got this teenage kid driving a truck behind me that's trying to keep up and I'm going over the speed limit." Zach, who was told to keep up, obliged.

49.     Just outside of Dalton, Minnesota, Coach Kerr passed a semi, which was in the right lane. Coach Lee also passed the semi. And Zach sped up to pass the semi. But as he did so, the semi-driver made a swift movement into the left lane. Zach veered to the left to avoid a crash, but as a teenage driver with only two years' experience, and traveling at 80 miles per hour, he lost control of the truck, which spiraled violently out of control, rolling over and landing in the westbound lane of I-94.

50.     Zach was killed. Connor and Morton were both thrown from the truck, landing in the westbound lane of the interstate. Morton skidded across the pavement for approximately 120 feet, which ripped most of the skin off his upper back, down to the bone in some areas. Morton also injured his head, lacerated his scalp, and skin was torn off his face, head and right side.

51.     Several people came upon the horrific crash and stopped to help. Pedro Lopez found Morton lying face down in a pool of blood and was certain he was dead. Morton woke up and Lopez asked him what happened. Morton didn't know. He just kept saying, "Just take me home, please. Just take me home." Lopez and others tried to calm him and gave him some water and a blanket. Another witness, Deb Van, tried to talk to Morton but he was confused, screaming in pain and his words were unintelligible. Morton was air-lifted to Sanford's Emergency Department in Fargo. Morton was treated for a traumatic brain injury, lacerations, burns, extensive road rash and other injuries. Connor died on the highway a short time after the crash. Schwandt was also injured, but survived.

52.     Neither Coach Kerr nor Coach Lee came to their players' aid to help or comfort them. In fact, Coach Kerr continued to drive for several miles before even turning around, although Coach Lee had called him to report that the Kvalvog boys were dead. In fact, Coach Kerr passed six emergency turnarounds before turning around at an exit to return to the crash site. Eyewitnesses confirmed that Coach Lee, the leader of this event, did not go to his dead, dying or injured players' aid, but was instead on his phone the entire time. Coach Lee's phone records establish that he made and received thirteen calls to school officials and others after the accident. Coach Lee did not call 911.

53.     In the aftermath of the crash, Coach Lee was consumed with protecting himself and the school from liability. Indeed, within a couple hours of the fatal crash, a pastor from one of PCS's

sponsoring churches, emailed his parishioners about the accident attempting to distance the school from the event and insulate it from liability: "The boys were heading to participate in a basketball tournament in Wisconsin when the accident occurred. *Although the trip was not sponsored by Park Christian*, some on the trip, including the Kvalvog boys were students at Park."

54.     While PCS coaches did not protect their players, they made every effort to protect themselves. Coach Kerr and Coach Lee lied both about their involvement in the accident and its aftermath. Coach Kerr made the incredible claim that his cruise control was set between 73 to 74 miles per hour, a mathematical impossibility given that the caravan traveled 65 miles in about 48 minutes. Coach Lee repeatedly changed his story about the accident, initially failing to disclose the involvement of the semi-truck and claiming that Zach had simply driven off the road. Coach Lee's lack of candor prevented Morton and the others from locating the semi-driver, the very party whom PCS blames for the accident. The semi-driver was never found.

55.     Moreover, Coach Lee lied about his response to the crash, falsely claiming under oath that he went to each of his dead, dying and injured players to offer them aid and comfort. In fact, eyewitnesses confirmed that Coach Lee did not go the boys and never got off his phone.

56.     After learning that his two sons had been killed, Mr. Kvalvog called Morton's mother to tell her the news that her son was injured. When Ms. Taylor heard that PCS officials put her son in a vehicle driven by a teenager, she was furious. She had never given the school permission, written or otherwise, for her son to ride to a school event hundreds of miles away in non-school transportation. And she most certainly did not give permission for a teenager to drive her son across the state, which is not even possible under PCS policy, given the school's absolute prohibition on players driving to out-of-town events.

57.     After the accident, Coach Lee was interviewed by Sergeant Eischens of the Minnesota State Patrol. Coach Lee said, "I'm the head boys basketball coach at Park Christian. We were taking *our varsity team* to Wisconsin Dells for team bonding and tournament time." But because of the egregious negligence of PCS, the boys never made it to the High School Shootout. Morton, unlike the Kvalvog boys, made it out alive. But his future in college sports and beyond was permanently derailed. Morton has persistent, ongoing pain and other issues resulting from his traumatic brain injury and has been permanently disfigured. Quite simply, Morton has never been the same since this wholly preventable crash. And PCS is to blame.

### COUNT ONE
### Direct Negligence Against PCS

58.     Plaintiff incorporates all previous paragraphs as if fully set forth under this count.

59.     PCS owed a duty of care to Morton because its own misfeasance created a foreseeable risk to Morton. Alternatively, PCS had a special relationship with Morton which gave rise to a duty of care.

60.     PCS assumed and exercised supervision and control of the activities of the PCS Team during practices and in connection with the High School Shootout. In their supervision and control of the tournament, PCS coaches and officials violated MSHSL policies, PCS policies and the law. PSC coaches and officials knew about and supported the tournament, including AD Richardson and Principal Nellermoe. Principal Nellermoe knew that Morton would participate in the tournament and repeatedly wished him, "Good luck in Wisconsin!"

61.     Coach Lee heavily promoted the High School Shootout and pressured players to participate, a violation of MSHSL policies.

62.     PCS took responsibility for planning for the High School Shootout, including coordinating transportation and lodging. Coach Lee filled out a PCS purchase voucher requesting

payment from the school for the tournament registration fee. Coach Lee completed the registration form, listing Park Christian School as the sponsoring school and enclosing a check issued by PCS. During a team meeting, Coach Lee told the players that coaches would drive the players in school vans. Coach Lee made the hotel reservations for the players. Coach Lee was active in preparing the team for the tournament, requiring players to attend early morning practice five days a week at the PCS gym, followed by an hour of weight-lifting, presided over by PCS Coach Doll.

63.     Coach Lee instructed players to wear their PCS travel gear on the trip and their PSC Team uniform at the High School Shootout. Although Coach Lee was responsible for coordinating transportation for the school event, he had been in Hawaii for two weeks just prior to the tournament and dropped the ball. And at some point, Principal Nellermoe refused Coach Lee's request for school transportation, a violation of PCS policy. Without school transportation, Coach Lee should have canceled the trip. He did not, which again, was a violation of PCS policy.

64.     Although there were four spots in Coach Lee's car, he insisted on driving alone. And he pointedly refused to drive Morton based on his racial animus.

65.     Coaches Lee and Kerr decided that teenaged Zach would have to drive three other teenagers the 450 miles across the state to the tournament, a violation of PCS policy which strictly forbids students from driving to out of town events.

66.     Before leaving the school parking lot, the coaches told Zach to keep up with them on the road. The coaches did not instruct Zach to stay in the middle of the caravan so they could both keep an eye on the boys. In fact, the coaches did not even discuss the possibility that Zach should remain in the middle for the sake of safety. Shortly after leaving the PCS parking lot, Coach Lee called Zach on his cell phone. Coach Lee told Zach to call him if the boys wanted to stop because Coach Lee wanted them to stay together on the road.

67.     Notably, Coach Lee did not give Zach any other instructions such as "drive safely," "buckle up," "don't speed," "don't text and drive," or "don't use your phone." In fact, the only instruction Coach Lee gave Zach was, that he should *use his phone* while driving to call Coach Lee if the boys wanted to stop.

68.     Traveling eastbound on I-94, Coaches Kerr and Lee proceeded to drive in excess of the posted speed limit, a violation of the law.

69.     PCS owed Morton a duty of care to act in a reasonably prudent manner in providing regulations and supervision for his safety and welfare with respect to the foreseeable hazards associated with PCS Team activities, including the High School Shootout.

70.     By committing the acts and omissions described above, PCS breached this duty of care and acted with deliberate disregard for Morton's safety.

71.     As a direct and proximate result of PCS's breaches of its duty, Morton has suffered and will continue to suffer damages in excess of $75,000.

### COUNT TWO
### Negligence Against Defendants Nellermoe, Lee and Kerr

72.     Plaintiff incorporates all previous paragraphs as if fully set forth under this count.

73.     Through their actions and omissions described above, Principal Nellermoe, Coach Lee and Coach Kerr (the "PCS Employee Defendants") in their roles as agents and/or employees of PCS, assumed supervision and control of the activities of the PCS Team during practices and in connection with the High School Shootout.

74.     The PCS Employee Defendants owed Morton a duty of care to act in a reasonably prudent manner in providing regulations and supervision for his safety and welfare with respect to the foreseeable hazards associated with PCS Team activities, including the High School Shootout.

75.     As a direct and proximate result of the PCS Employee Defendants' breaches of their duties, Morton has suffered and will continue to suffer damages in excess of $75,000.

### COUNT THREE
### Negligence Per Se Against Defendants Lee and Kerr

76.     Plaintiff incorporates all previous paragraphs as if fully set forth under this count.

77.     Defendants Lee and Kerr, in their roles as agents and/or employees of PCS, instructed Zach to stay together on the road and proceeded to drive in excess of the speed limit.

78.     Defendants Lee and Kerr committed negligence per se when they violated the speed limit in violation of Minnesota Statute §169.14, Subd. 2.

79.     Morton was among those the legislature intended to protect by enacting Minnesota Statute §169.14, Subd. 2.

80.     The harm suffered by Morton as a result of the coaches' violation of law is the type of harm the legislature intended to prevent by enacting the statute.

81.     As a direct and proximate result of Lee's and Kerr's violation of Minnesota Statute §169.14, Subd. 2, Morton has suffered and will continue to suffer damages in excess of $75,000.

### COUNT FOUR
### Vicarious Liability for the Negligence of the PCS Employee Defendants

82.     Plaintiff incorporates all previous paragraphs as if fully set forth under this count.

83.     Defendants Nellermoe, Lee and Kerr were employees and/or agents of Defendant PCS at all relevant times.

84.     Defendants Nellermoe, Lee and Kerr were acting within the course and scope of their employment with Defendant PCS when they committed the negligent acts and omissions described above.

85.     Defendant PCS is liable to Morton under the common law doctrines of respondeat superior, agency and vicarious liability for the negligent acts and omissions of Defendants Nellermoe, Lee and Kerr.

86.     As a direct and proximate result of the negligent acts and omissions of Defendants Nellermoe, Lee and Kerr, Morton has suffered and will continue to suffer damages in excess of $75,000.

## COUNT FIVE
### Negligent Supervision Against PCS

87.     Plaintiff incorporates all previous paragraphs as if fully set forth under this count.

88.     Coaches Lee and Kerr were employed by PCS when they committed the wrongful acts alleged herein. Coaches Lee and Kerr engaged in the wrongful conduct while acting in the course and scope of their employment with PCS.

89.     The outcome in this case was foreseeable to PCS. PCS policy requires that, "High school students and coaches will travel to and from the game by school transportation as provided." PCS policy also strictly forbids players from driving their own vehicles to out-of-town events. These policies were expressly drafted to keep players safe. The conduct of Coaches Lee and Kerr in violating PCS policy was foreseeable to PCS. Indeed, Principal Nellermoe was present at PCS the morning of the trip and knew that the PCS Team was traveling without school transportation.

90.     PCS failed to exercise ordinary care in supervising Coaches Lee and Kerr, and in failing to prevent the foreseeable misconduct of the coaches, which caused harm to others, including Morton.

91.     As a direct and proximate result of PCS's negligent conduct, Morton has suffered and will continue to suffer damages in excess of $75,000.

## COUNT SIX
### Breach of Fiduciary Duty Against PCS

92.     Plaintiff incorporates all previous paragraphs as if fully set forth under this count.

93.     PCS coaches and officials held a superior position to Morton in terms of knowledge and authority. Morton, a teenager, was living away from his mother and his home in Mississippi, in order to join PCS's basketball team and community. Morton, who was in a subservient position to the coaches and school officials of PCS, placed his trust and confidence in PCS. Consequently, a special relationship existed between PCS and Morton.

94.     As a result of this special relationship, PCS had a duty to protect Morton from harm.

95.     By committing the acts and omissions described above, PCS breached its fiduciary duty to Morton.

96.     As a direct and proximate result of PCS's breach, Morton has suffered and will continue to suffer damages in excess of $75,000.

### JURY DEMAND

Morton demands a trial by jury on all claims and issues for which he has a right to trial by jury.

**WHEREFORE**, Morton respectfully requests a judgment of the Court against Defendant as follows:

1.     A money judgment against Defendants for negligence and breach of fiduciary duty, in excess of $75,000, with the specific amount to be proven at trial;

2.     Ordering Morton be awarded all his costs, disbursements, witness fees, and attorney fees as allowed under law;

3.     For an award to Morton of all prejudgment interest; and

4.      Such other and further relief as the Court deems just and equitable.

**PARKER DANIELS KIBORT LLC**

Date:  December 20, 2019                 */s/ Lori A. Johnson*
                                          Andrew D. Parker (#195042)
                                          Lori A. Johnson (#311443)
                                          Jordon C. Greenlee (#397478)
                                          888 Colwell Building
                                          123 North Third Street
                                          Minneapolis, MN  55401
                                          (612) 355-4100
                                          *parker@parkerdk.com*
                                          *johnson@parkerdk.com*
                                          *greenlee@parkerdk.com*

                                          *Attorneys for Plaintiff Jimmy Morton*

24