UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jimmy Morton,                       File No. 19-cv-03134 (ECT/LIB)

         Plaintiff,

v.                               **OPINION AND ORDER**

Park Christian School, Inc., Christopher
Nellermoe, Joshua Lee, and Timothy Kerr,

         Defendants.[1]

Lori A. Johnson, Andrew D. Parker, and Jordon Greenlee, Parker Daniels Kibort LLC, Minneapolis, MN, attorneys for Plaintiff Jimmy Morton.

Amanda M. Cialkowski, Brian N. Johnson, Kelly P. Magnus, Leah N. Kippola-Friske, and Matthew C. Murphy, Nilan Johnson Lewis PA, Minneapolis, MN; and Tammy M. Reno, Arthur, Chapman, Kettering, Smetak & Pikala, PA, Minneapolis MN, attorneys for Defendants Park Christian School and Christopher Nellermoe.

Richard C. Scattergood, Tomsche, Sonnesyn & Tomsche, P.A., Minneapolis, MN, attorney for Defendant Christopher Nellermoe.

Briana Gornick and William L. Moran, HAWS-KM, P.A., St. Paul, MN, attorneys for Defendant Joshua Lee.

Brian Michael Hansen, St. Paul, MN; Paul S. Hopewell, Lilleberg & Hopewell, Edina, MN; and Tammy M. Reno, Chapman, Kettering, Smetak & Pikala, PA, Minneapolis, MN, attorneys for Defendant Timothy Kerr.

---

[1]      This case's docket identifies Raymond and Katherine Kvalvog as "objectors." The Kvalvogs appeared in this case only to oppose a motion filed by Defendants to compel the Kvalvogs' compliance with a document subpoena. *See* ECF Nos. 82 (Motion), 116 (Order). The Kvalvogs are not parties, and they did not appear in connection with the summary-judgment motions addressed here.

This diversity case arises out of a June 2015 motor-vehicle accident. Plaintiff Jimmy Morton was a passenger in a pickup truck driven by Zachary Kvalvog. Morton, Zachary, and two other passengers in the truck—Zachary's brother, Connor, and Mark Schwandt—were members of a basketball team representing Defendant Park Christian School in Moorhead, Minnesota. Zachary was driving the third vehicle in a three-car caravan to a basketball tournament in Wisconsin Dells. Defendants Joshua Lee, Park Christian's head basketball coach, and Timothy Kerr, its head football coach, drove the other two vehicles. Roughly 45 minutes into the trip, a semi-trailer truck encroached on the left lane where Zachary was driving. In his efforts to avoid the encroaching semi, Zachary lost control of the pickup, and it crashed. Zachary and Connor Kvalvog were killed in the crash, and Morton and Schwandt suffered injuries. In this case, Morton asserts negligence claims against all Defendants and a claim for breach of fiduciary duty against the school.[2]

Seven motions require a decision. Defendants have filed six of these, including two motions to exclude the testimony of Morton's proffered liability experts, one motion to exclude a damages-related expert, and three summary-judgment motions, one filed each

---

[2]     This is the third case arising out of the accident. The first case—brought by Zachary and Connor Kvalvog's parents, Raymond and Katherine—adjudicated liability for Zachary and Connor's deaths. *See Kvalvog v. Lee*, Nos. A20-0693, A20-1587, 2021 WL 3027269 (Minn. Ct. App. July 19, 2021), *review denied* (Minn. Sept. 30, 2021). The second case— also brought by Raymond and Katherine—involves allegations that defendants in the first case and others corrupted that case and defamed Raymond and Katherine. *See Kvalvog v. Park Christian School, Inc.*, No. 21-cv-1569 (ECT/LIB), 2022 WL 119010 (D. Minn. Jan. 12, 2022), *appeal filed* [ECF No. 84]. The second case is pending before the Eighth Circuit, No. 22-1315, with oral argument scheduled to occur on October 20, 2022. *See* https://www.ca8.uscourts.gov/argument-calendars (last visited October 3, 2022).

by Park Christian, Lee, and Kerr.  Morton has filed a motion for partial summary judgment

on two issues.  The upshot is this:

- Defendants' two motions to exclude Morton's liability experts will be granted in part and denied in part.  The partial denial of these motions means that portions of the two challenged experts' opinions remain part of the summary-judgment record and, as it turns out, relevant to disposition of the summary-judgment motions.

- The summary-judgment motions filed by Park Christian School and Coach Lee will be denied with respect to Morton's negligence claims.  I conclude this result follows necessarily from the Minnesota Supreme Court's decision in *Fenrich v. The Blake School*, 920 N.W.2d 195 (Minn. 2018).

- Kerr's summary-judgment motion will be granted with respect to Morton's negligence claims.  No reasonable juror could find that Kerr assumed supervision and control over the Wisconsin Dells trip, a necessary predicate to his liability under *Fenrich*.

- Lee and Kerr's summary-judgment motions will be granted with respect to Plaintiffs' negligence *per se* claims.  The basis for these claims are traffic violations, something Minnesota law says cannot be predicates for a negligence *per se* theory.

- Park Christian's summary-judgment motion will be granted with respect to Morton's breach-of-fiduciary-duty claim.  No reasonable juror could find that Park Christian owed Morton a fiduciary duty.

- Lee's summary-judgment motion based on Minnesota's nonprofit-service immunity statute, Minn. Stat. § 317A.257, will be denied because legal and factual questions remain regarding whether Lee "personally and directly" caused Morton's injuries.

- Morton's motion for partial summary judgment as to the "school-activity" and duty issues will be denied.  Issue-preclusion principles do not justify adopting the state district court jury's school-activity finding here, and many fact issues preclude summary judgment on the duty issue.

3

I

*The Defendants.*  Park Christian is a private K–12 school in Moorhead, Minnesota. ECF No. 160-1 Ex. A at 279–80.  Christopher Nellermoe was Park Christian's principal when the accident occurred; he now serves as Park Christian's president.  *Id.* Ex. B at 15– 16.[3]  Lee served as Park Christian's head basketball coach for the 2014–15 and 2015–16 seasons.  *Id.* Ex. C at 29–30, Ex. D, Ex. F.  Kerr was Park Christian's head football coach for the 2014 and 2015 seasons.  *Id.* Ex. G at 14–16, Ex. H, Ex. I; ECF No. 155-1 Exs. 8, 9.

*The Plaintiff.*  In April 2015, Morton was 18 years old and living in Jackson, Mississippi, where he was a high school junior.  ECF No. 162 Ex. DD at 7, 10–11, Ex. EE at 39–40; *see also* ECF No. 53 and ECF No. 55.  Morton was a talented basketball player and had drawn attention for his high-jumping skills in track and field.  *See* ECF No. 55 ¶¶ 4, 6.  He had "received lots of letters from colleges" recruiting him for basketball and track and field.  ECF No. 53 ¶ 4.

*Morton travels to Fargo to explore attending and playing basketball at Park Christian.*  Morton's cousin, Alonzo, lived in Fargo, North Dakota.  Alonzo persuaded Morton to travel to Fargo, where he might obtain greater exposure as a high school basketball prospect.  ECF No. 162 Ex. DD at 21, Ex. EE at 23–26.  Alonzo's son had played basketball with Park Christian team members Zachary and Connor Kvalvog, and Alonzo wanted Morton to play basketball at Park Christian.  *Id.* Ex. FF at 32–36, 58, 80, 208–10, Ex. EE at 23–26; ECF No. 53 ¶ 5.  Alonzo spoke to Coach Lee, Kerr, and Raymond

---

[3]      Nellermoe was dismissed by stipulation.  ECF No. 196.  Therefore, his separate summary-judgment motion, ECF No. 119, will be denied as moot.

Kvalvog, Zachary and Connor's father, about Morton before he arrived. ECF No. 176-4 Ex. 18 at 56; *see also* ECF No. 162 Ex. FF at 66–69, 72; ECF No. 160-1 Ex. C at 62–64, Ex. G at 63, Ex. M at 105. A number of people called Morton's mother, Sondra Turner, about Morton attending Park Christian, including Raymond Kvalvog, a different person who identified himself as a Park Christian coach (though Turner does not remember this person's name), and another person who called to arrange a tour of the school. ECF No. 55 ¶¶ 8–9; ECF No. 176-5 Ex. 21 at 218–21. Morton flew to Fargo alone on June 5, 2015. ECF No. 162 Ex. EE at 85–87, Ex. GG, Ex. FF at 78. Raymond Kvalvog met Morton at the airport and brought him to meet and play basketball with Zachary. *Id.* Ex. EE at 27–28. Morton met Head Coach Lee on his first day practicing with members of the Park Christian team. *Id*. Ex. DD at 19–20. After spending the next three weeks with the team, Morton had decided to attend and play basketball at Park Christian and was working to persuade his mother to move with him to Fargo. *Id*. at 20.

*The Park Christian summer basketball program.* Coach Lee organized a summer program for members of the Park Christian basketball team. In 2015, this program involved morning practices, games in a local summer league, and several tournaments, including a tournament in the Wisconsin Dells on June 25 and 26. ECF No. 160-1 Ex. C at 37–38, 56–62, Ex. E at 75, Ex. J, Ex. K at 11–12. The summer program was voluntary, but Coach Lee encouraged players to participate, and more experienced players were invited to tournaments. ECF No. 160-1 Ex. C at 60–62, 139–40, 160–62, Ex. G at 160, Ex. L, Ex. K at 12–13. Morton participated in the summer basketball program after he arrived on June 5, regularly practicing with Park Christian players, lifting weights, participating in

scrimmages against other high-school teams, and playing in a Tuesday-night league where Lee coached.  ECF No. 53 ¶¶ 7–8.  Though Morton participated in the 2015 summer program, it is undisputed that he was not then enrolled (and would not enroll) at Park Christian.  *Id*.

*The Park Christian transportation policy.*  Park Christian had a transportation policy that appeared in its Athletic Handbook.  ECF No. 176-7 Ex. 27 at 12.  Among other things, the policy provided that "[h]igh school students and coaches will travel to and from the game by school transportation as provided," and that "[a]ll high school athletes must . . . take the team-arranged transportation to all out-of-town games."  *Id*.  The Handbook further stated that "[p]layers who travel to out-of-town games using non-school arranged transportation must get written permission from their parent/guardian, coach, Activities Director and Principal in advance."  *Id*.  In addition, the Handbook stated that "[n]o students will drive their own cars from school to an out of town meet or event."  *Id*.

*The Wisconsin Dells tournament.*  Coach Lee learned of the Wisconsin Dells tournament in March or April 2015.  ECF No. 161 Ex. N at 38–39.  He initially requested school transportation or vans for the tournament, but Nellermoe refused.  ECF No. 176-8 Ex. 29 at 47–48, 148–49; ECF No. 160-1 Ex. C at 112–15, 137–38, 148–49.  Coach Lee met with players in April or May 2015 to gauge interest in participating in the Wisconsin Dells tournament.  At that time, Lee proposed an itinerary, explained that the players would be responsible for room and meal expenses, and told the players that if they rode with someone, they should offer to help with gas.  ECF No. 160-1 Ex. C at 96–97; ECF No. 161 Ex. U.  Coach Lee registered for the tournament as the "Park Christian School" team, with

a check processed by the Park Christian business office and funded from the Park Christian boys' basketball account. ECF No. 160-1 Ex. C at 80–82, 278–79, 296–97; ECF No. 161 Ex. N at 49, Ex. P at 23–24, 54–55, 59–62, Ex. V, Ex. W at 23–24, Ex. X; *see also* ECF No. 162 Ex. HH (tournament schedule listing team as "Park Christian"). The school secretary (who typically scheduled Park Christian athletic transportation) asked Coach Lee if a bus was needed to transport the players because she "thought they should have been on a bus, because it was all of our students and it was a long ways to go," but Lee believed the event was outside of the school's transportation policy based on his earlier conversation with Nellermoe. ECF No. 176-3 Ex. 16 at 21–22; ECF No. 176-1 Ex. 3 at 112. The day before leaving for the tournament, Coach Lee gave each of the participating players a travel uniform, including a practice jersey, a polo shirt, and shorts, and each item bore the Park Christian name. ECF No. 160-1 Ex. C at 101; ECF No. 162 Ex. DD at 40, Ex. EE at 221–22; ECF No. 171-1 at 293–94. Coach Lee instructed the players to wear their Park Christian clothing when they left for the tournament the next day. ECF No. 171-1 Ex. B at 296; ECF No. 176-3 Ex. 15 at 14–15; ECF No. 53 ¶ 14. Morton recalled Lee telling the team: "We play as a team, we eat as a team, we dress as a team." ECF No. 53 ¶ 14.

*Final travel arrangements for the Wisconsin Dells Tournament.* Nine players opted to participate in the tournament: Defendant Timothy Kerr's sons, Jordan and Ryan Kerr, Zachary and Connor Kvalvog, Mark Schwandt, Jimmy Morton, Brock Aamodt, Tyrell Rodriguez, and Steele Senske, Jr. ECF No. 162 Ex. JJ. On the Saturday three days before they departed for the tournament, Lee emailed a schedule, itinerary, and waiver forms, all from his Park Christian email account. *Id.* Coach Lee confirmed that the players would

leave the school at 8:00 o'clock on the morning of Tuesday, June 23. *Id.* Kerr testified that travel plans for the tournament were "fluid," and by all accounts the plans remained unsettled until the day of the trip. ECF No. 161 Ex. Y at 59. After Nellermoe refused to provide school transportation, Coach Lee, Kerr, and Raymond Kvalvog planned the transportation. ECF No. 160-1 Ex. C at 118, Ex. G at 44–45, Ex. L; ECF No. 161 Ex. N at 57–61, 72–73, Ex. Y at 63. Coach Lee and Kerr agreed to drive to the tournament. ECF No. 160-1 Ex. C at 103–04, 271, Ex. G at 44–45, 165–66; ECF No. 161 Ex. N at 219–20, Ex. Y at 59–60, 69, Ex. Z at 31–32. How Zachary Kvalvog ended up driving is not clear. There is testimony that Raymond Kvalvog first asked other parents to drive his vehicle to the tournament, but instructed Zachary to drive after no parent volunteered; there also is testimony that, when he arrived at Park Christian on the morning of June 23, Raymond Kvalvog expected that one or more parents (in addition to Coach Lee and Kerr) would drive, but at the last minute, he, Lee, and Kerr decided that Zachary would drive. *See* ECF No. 188 at 20; *see also* ECF No. 159 at 8–9; ECF No. 160 Ex. C at 119–21, Ex. G at 84–85, 166–68; ECF No. 161 Ex. N at 79–80, Ex. S at 22–23, 27, 37–38, Ex. T at 18–21, Ex. Y at 59–60; ECF No. 163 Ex. LL at 9–10, 33–36, 38–40. Ultimately, four people drove to the tournament in personal vehicles: Coach Lee drove alone; Kerr drove, transporting his wife and four players, including the Kerrs' two sons; Zachary Kvalvog drove his father's pickup truck, carrying Connor Kvalvog, Mark Schwandt, and Morton as passengers; and Steele Senske drove his son, Steele, Jr., in a fourth car. *See* ECF No. 162 Ex. II at 25–26; Ex. JJ; ECF No. 163 Ex. LL; ECF No. 155-1 Ex. 5 at 219. Coach Lee, Kerr, and Zachary Kvalvog set off in a caravan together, with the Senske vehicle leaving later. ECF No.

155-1 Ex. 3 at 95; ECF No. 162 Ex. II at 8–9, 19–20; ECF No. 163 Ex. LL.  Neither Coach

Lee nor Kerr provided Zachary safety instructions before they left.  ECF No. 176-3 Ex. 17

at Response to RFA No. 18, Ex. 19 at 94.  After the caravan left the school, Coach Lee

called Zachary by cell phone and told Zachary to call if anything came up.  ECF No. 176-

8 Ex. 29 at 128–32.  Lee testified that he made that call to Zachary so the caravan "could

stay together." *Id*.

*The accident*.  The accident occurred approximately 45 minutes into the trip to the

Wisconsin Dells tournament.  As the caravan was moving along Interstate 94 near Dalton,

Minnesota, Kerr first passed a semi-trailer truck that was driving in the right lane.  Coach

Lee followed and passed the semi as well.  When Zachary moved into the left lane and

tried to pass the semi, the semi veered into Zachary's lane.  Zachary swerved to the left to

avoid colliding with the encroaching semi, overcorrected, and lost control of the pickup

truck.  Zachary's truck rolled.  Morton lost consciousness as the truck started to roll.  Both

Morton and Connor were ejected from the vehicle.  ECF No. 165 Ex. WW.  Zachary and

Connor Kvalvog died at the scene of the accident.  Morton suffered serious injuries,

including a traumatic brain injury, an injury to his left shoulder, and severe abrasions.  ECF

No. 53 ¶ 20.  Schwandt was also injured but survived.  By all accounts, the caravan was

driving over the posted speed limit, traveling at between approximately 75 and 80 miles

per hour before the accident occurred.  ECF No. 160-1 Ex. G at 127–28, 178–79, Ex. K at

27, 101; ECF No. 161 Ex. N at 116–17, Ex. T at 25–26, Ex. Y at 21, 80–81; ECF No. 163

Ex. PP; ECF No. 165 Ex. WW.  Zachary was driving 77 miles per hour at the time of the

accident and made a normal lane change as he prepared to pass the semi.  ECF No. 160-1

Ex. K at 20, 126; ECF No. 162 Ex. DD at 59–61, 66–67, 80, Ex. EE at 367–68; ECF No.

165 Ex. UU at 3, Ex. VV at 16–17.

*Zachary's driving record.*   Zachary Kvalvog was 18 years old on the day of the

accident, and he had been a licensed driver since he passed the test "on his third try" in

March 2013.  ECF No. 162 Ex. AA at 41.  According to his parents, Zachary was a "very

responsible, very good driver, very cautious," and had never been in an accident or received

any traffic tickets.  *Id*. at 40–41; ECF No. 163 Ex. LL at 26, 29.  Zachary had driven to the

family's cabin in Barnesville on previous occasions, which required him to drive east on

I-94, over the same part of I-94 where the crash occurred.  ECF No. 161 Ex. Z at 141–42,

184–85; ECF No. 162 Ex. AA at 130–31; ECF No. 163 Ex. LL at 29–30.  There is no

evidence that Zachary was tired or impaired on the day of the accident.  Morton, who was

riding in the back seat on the passenger's side, testified that Zachary was not on his phone,

texting, or otherwise distracted at the time of the accident—Zachary had his eyes on the

road, signaled his turn, and made a normal lane change in preparation of passing the semi—

and by all accounts, it was the encroaching semi that forced Zachary off the road.  ECF

No. 162 Ex. DD at 57–60, 66–67, 80, Ex. EE at 368.  Morton testified that when the

accident occurred, Zachary was alongside the semi, the semi veered suddenly across the

centerline into his lane, and Zachary was forced to "make an evasive move and turn the

wheel left" to avoid a collision.  *Id*. Ex. DD at 65–68, 70–73, 83, 159–60, 174–75, Ex. EE

at 169, 176–78, 231, 236, 362, 411.  Morton later described Zachary as "a very cautious,

safe driver."  *Id*. Ex. EE at 362–63.  Morton testified that there was never a time that day

that he thought Zachary was driving unsafely in any respect, and even looking back on the accident with hindsight, Morton believed that Zachary did nothing wrong. *Id*. at 368, 411.[4]

*Morton's claims.* Morton asserts claims across six counts in his Complaint: (1) a "direct negligence" claim against Park Christian, Compl. [ECF No. 1] ¶¶ 58–71; (2) a negligence claim against Nellermoe, Coach Lee, and Kerr, *id.* ¶¶ 72–75; (3) a negligence per se claim against Lee and Kerr, *id.*¶¶ 76–81; (4) a claim against Park Christian based on vicarious liability for the negligence of Nellermoe, Lee, and Kerr, *id.* ¶¶ 82–86; (5) a negligent-supervision claim against Park Christian, *id.* ¶¶ 87–91; and a breach-of-fiduciary-duty claim against Park Christian, *id.* ¶¶ 92–96.

## II

One binding Minnesota Supreme Court decision in particular—*Fenrich v. The Blake School*, 920 N.W.2d 195 (Minn. 2018)—bears on most of the pending motions, so it makes good sense to begin by reviewing that case's basic facts and the Supreme Court's holding.

In November 2011, after the Minnesota State High School League's official cross-country season had ended, fourteen members of The Blake School's cross-country team traveled to Sioux Falls, South Dakota, to compete in the Nike Cross Nationals

---

[4]      There is record evidence suggesting Zachary drove less than cautiously at one point early in the trip.  Coach Lee testified that when the caravan first set out, "Zach[ary] had attempted driving in the middle kind of and he had been playing Pac-Man with the stripes for a little bit," and Coach Lee "was about to pull over to the left and slow down so [Lee] could get [Zachary's] attention but [Zachary] went over … and was good from that point on." ECF No. 163 Ex. PP.  Coach Lee explained that by "Pac-Man," he meant that Zachary was probably a foot or two into the other lane, straddling the centerline. *Id*.  Otherwise, Lee stated that Zachary had been "just keeping up basically and never fell behind or came speeding up on [Lee] or anything like that."  *Id*.

Heartland Regional Meet. *Id.* at 198. The team traveled in a two-car caravan. *Id.* at 199. The team's assistant coach drove one car. *Id.* The second car was driven by T.M., a sixteen-year-old team member. *Id.* at 198–99. "Three people rode with T.M.: two students and [a] volunteer coach, who was located in the back seat behind T.M." *Id.* at 199. Near Lewisville, Minnesota, T.M. swerved over the highway's centerline into oncoming traffic. *Id.* at 200. The evidence showed that T.M. swerved over the centerline because he "was probably distracted by his own phone." *Id.* T.M.'s car collided with a car driven by Gary Fenrich. *Id.* at 198, 200. Gary was killed, and his wife, JeanAnn, who was a passenger in the car, was seriously injured. *Id.* As relevant here, JeanAnn, in her individual capacity and as Gary's trustee, sued The Blake School for negligence. *Id.* at 201.

Under Minnesota law, a negligence claim has four elements: "'(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of that duty being the proximate cause of the injury.'" *Id.* (quoting *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001)). Reversing the entry of summary judgment in the school's favor on the duty element, the court held that Fenrich's negligence claim was trial-worthy. The court acknowledged the general rule that "'a person does not owe a duty of care to another . . . if the harm is caused by a third party's conduct.'" *Id.* at 201 (quoting *Doe 169 v. Brandon*, 845 N.W.2d 174, 177–78 (Minn. 2014)). The court, however, found that a reasonable juror could conclude that the school's conduct fit an exception to the general rule triggered when a "'defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff.'" *Id.* at 202 (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011)). The court explained that whether a risk had been created by the school's "own conduct" was

genuinely disputed because "the school went beyond passive inaction by assuming supervision and control over its athletic team's trip to Sioux Falls." *Id.* at 203. And the court determined that the question of the risk's foreseeability was trial-worthy because "whether T.M.'s driving created an objectively reasonable expectation of danger to the public is at least a close call." *Id.* at 205 (quotation omitted). The court described several factors to support this determination:

> On the other hand, T.M. was not an adult, but was a teenager (age 16), who had been licensed for less than 6 months. He was driving a lengthy distance with no adults—only other teenagers—in the car. He could not legally drive multiple passengers who were under the age of 20. In preparation for the drive, the assistant coach provided no instructions to T.M., except, shortly before the accident, to "keep it safe and keep rolling." The assistant coach did tell the volunteer coach, another teenager, to ride in the car with T.M., but gave no specific instructions to the volunteer coach to monitor T.M.'s driving, or to ensure that T.M. did not become distracted while driving. Nor did the assistant coach tell the volunteer coach to sit in the front passenger seat, where T.M.'s driving could have been better supervised.

*Id.* at 206.

The court essentially ordered the case remanded to the district court for trial, cautioning that "nothing in our decision prevents the school from arguing at trial the specific elements of negligence: that the school had no duty because its conduct did not create a foreseeable risk of injury to Fenrich; that the school did not breach a duty; and that the school's conduct was not the direct and proximate cause of the injuries." *Id.* at 207; *see also Smits v. Park Nicollet Health Servs.*, --- N.W.2d ---, No. A20-0711, 2022 WL 4088383, at *16 (Minn. Sept. 7, 2022) (applying *Fenrich*); *Verhel v. Ind. Sch. Dist. No.*

*709*, 359 N.W.2d 579 (Minn. 1984) (on which *Fenrich* relied).   With *Fenrich* in mind, turn to the pending motions.

III

Defendants seek to exclude the testimony of two of Morton's liability experts: Steven R. Arndt, Ph.D., as to his opinions regarding human factors and ergonomics; and Thomas N. Rush, as to his opinions regarding reconstruction of the accident.   Though Morton does not say that either expert's proffered testimony is essential to defeating Defendants' summary-judgment motions, he cites parts of each expert's report in opposing Defendants' motions.   It thus makes sense to start with Defendants' motions to exclude because they have the potential to narrow the factual record on which the summary-judgment motions will be adjudicated.

A

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.   That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and

14

> (d)   the expert has reliably applied the principles and methods to the facts of the case.

*See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  "District courts have wide latitude in determining whether an expert's testimony is reliable."  *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007) (citation omitted).  District courts have identified a number of factors they may consider in determining whether an expert's testimony is the product of "reliable principles and methods," including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006) (citation omitted).  "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands.  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).  As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs.  *Id.*  "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."  *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted).  But the court must exclude an expert's opinion if it "is

so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (citation omitted).  "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).  Furthermore, "under *Daubert* and Rule 403 of the Federal Rules of Evidence, the probative value of the expert testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." *United States v. Solorio-Tafolla*, 324 F.3d 964, 966 (8th Cir. 2003) (citation omitted).

## B

According to Dr. Arndt, the field of "[h]uman factors deals with the interaction of people, information, tools, technology, and organizations within systems." ECF No. 130-1 at 6; *see Jayne v. City of Sioux Falls*, No. 4:18-cv-04088-KES, 2020 WL 2129599, at *4 (D.S.D. May 5, 2020) ("Generally, an expert in human factors analyzes the interaction between human behavior and an object or environment.").

Dr. Arndt offers three opinions in his report.  First, Dr. Arndt recounts extensive factual background tending to show Park Christian's involvement (through Coach Lee and others) in the summer basketball program and participation in the Wisconsin Dells tournament.  ECF No. 130-1 at 6–23.  Based on these facts, Dr. Arndt opines: "The controlling entity of the system that the players and coaches were operating under was Park Christian School (PCS)." *Id.* at 6.  Second, Dr. Arndt describes Park Christian's transportation policies, the circumstances leading up to the decision to drive private vehicles to the Wisconsin Dells tournament, transportation policies of other organizations,

general risks associated with teenage driving, the circumstances of the accident, and the influential role athletic coaches may play in the lives of young athletes. *Id.* at 23–44. From these facts, Dr. Arndt concludes:

> Park Christian School (PCS) had safety policies in place prohibiting students to drive from school to out of town meets or events. Had PCS and its employees, including the coaches who were the authority figures, complied with such policies, this incident would have been prevented.

*Id.* at 23. Third, relying on Park Christian's transportation-safety policies and a variety of facts regarding the lead-up to the decisions to drive private vehicles and allow Zachary Kvalvog to drive to the tournament, Dr. Arndt concludes: "Even if the official school vans were unavailable, it would have been safer for the coaches and Park Christian School (PCS) to provide adult driven vehicles or commercial transport for students traveling to the tournament." *Id.* at 44–45.

1

Dr. Arndt's proffered testimony regarding his first opinion—that Park Christian was the "controlling entity"—deserves exclusion under Rule 702 or, alternatively, under Rule 403. This opinion does not meet Rule 702's requirements that expert testimony be "the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702(c), (d). Dr. Arndt's controlling-entity determination is really just a factual conclusion drawn from evidence showing that Park Christian assumed supervision and some control over the basketball team's trip to the Wisconsin Dells. Dr. Arndt identifies no scientific, technical, or other specialized method or analysis that he applied to reach his controlling-entity conclusion. Dr. Arndt seems to acknowledge the merely

factual nature of this conclusion in the final paragraph of this section of his report. There, after recounting across roughly seventeen pages the evidence showing Park Christian's involvement in the Wisconsin Dells trip, Dr. Arndt concludes that "*[f]actual evidence indicates* that [Park Christian] was the controlling system authority for the entry, participation, funding, and travel to the event," and that this same "*[f]actual evidence also indicates*" that the players who planned to participate in the tournament "were acting as school representative[s] and being supervised and coached by school coaches." ECF No. 130-1 at 23 (emphasis added). In other words, as far as his report describes things, Dr. Arndt reached his first opinion just as a juror might: he considered evidence and drew commonsense inferences to reach a factual conclusion, and he identifies no particular expertise on which he might have relied to reach this conclusion. These same considerations also show that Dr. Arndt's first opinion fails Rule 702's requirement that it "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). As presented, the focus of Dr. Arndt's first opinion—whether Park Christian assumed supervision and control over the Wisconsin Dells trip—is an issue lay jurors should have little difficulty understanding. The proffered testimony therefore will not help the jury. Fed. R. Evid. 702(a); *see also United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir. 1995) ("Expert testimony is helpful to a jury if it concerns matters beyond the knowledge of average individuals; however, it cannot supplant the jury's role in evaluating the evidence."). For essentially these same reasons, leaving Rule 702 aside, there is a substantial risk that a jury would give Dr. Arndt's expert-cloaked controlling-entity opinion far greater weight than it deserves. In other words, allowing Dr. Arndt to testify on this

issue would pose a substantial risk of unfair prejudice that substantially outweighs the probative value of Dr. Arndt's testimony.  Fed. R. Evid. 403.

Morton's arguments in defense of Dr. Arndt's first opinion are not persuasive. Morton does not suggest that Dr. Arndt's report describes reliable principles and methods, evidently acknowledging the point.  Instead, Morton points to Dr. Arndt's deposition testimony and asserts that Dr. Arndt explained there "that his conclusions are grounded in systems analysis." ECF No. 181 at 7.  To support this assertion, Morton cites Dr. Arndt's answer to a question concerning the source of the term "controlling entity."  Dr. Arndt answered:

> Well, because when we're looking at the system of information of supervision, of monitoring, of behavioral change, that is an exertion of control.  And we're looking at organizations, coaching organizations, teams, schools, those can be described as entities.  I put those two words together to describe the system that was in place leading up to this incident.

ECF No. 130-2 at 14.  Whatever this answer might explain about Dr. Arndt's understanding or intent behind his use of the term "controlling entity," the answer describes no reliable principles or methods that might support Dr. Arndt's conclusion.  Morton next argues that Dr. Arndt's controlling-entity opinion falls within the human-factors field and thus Dr. Arndt's expertise.  This seems true, but Rule 702 does not make expert testimony admissible just based on a proffered expert's qualifications.  Under the Rule, expert qualifications are a necessary—not a sufficient—predicate to admissibility.  As explained, Dr. Arndt's controlling-entity opinion fails to meet other necessary predicates.  Finally, Morton recounts the facts on which Dr. Arndt grounds his controlling-entity opinion, but

this does not answer the problems identified with Dr. Arndt's first opinion.  The issue is not the absence of facts to support Dr. Arndt's controlling-entity opinion; the exclusion-worthy problem is Dr. Arndt's non-scientific, non-technical approach to interpreting the facts.  Morton does not address the Rule 403 problem.

2

Dr. Arndt's second opinion is that the incident would not have happened had Park Christian followed its own transportation-safety policies.  The answer to whether this opinion should be excluded is mixed.

Defendants do not seem to challenge Dr. Arndt's proffered testimony regarding Park Christian and other schools' adoption of transportation-safety policies.  The absence of this challenge makes sense.  The existence, content, and purposes of these policies are relevant to questions of foreseeability and duty, likely go beyond the average juror's familiarity, and fall within Dr. Arndt's areas of expertise.  *See* ECF No. 187-4 Ex. V at 1.

Dr. Arndt's proffered testimony that "this incident would have been prevented" had Defendants complied with Park Christian's transportation-safety policies will be excluded.  It is speculative.  There are many conceivable ways Defendants might have complied with Morton's interpretation of Park Christian's transportation-safety policies, and it is speculative to say that all policy-compliant travel would have prevented the crash.  Who is to say, for example, that the same tragic crash would not have happened had Zachary's father, Raymond, been driving and encountered the same lane-encroaching semi-truck?  Perhaps because of the speculation involved, Dr. Arndt does not address this hypothetical or others like it.  The opinion also is disconnected from Dr. Arndt's expertise.  As far as

20

his report reflects, Dr. Arndt's conclusion that "this incident would have been prevented" is based on simple, if logical, reasoning: forbidding Zachary from driving would have eliminated the occasion for the crash. That logic requires no "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). Regardless, the opinion is unhelpful and would risk jury confusion. As described in *Fenrich*, the issue is whether Defendants' alleged breach of their duty (by assuming supervision and control over the trip to the Wisconsin Dells tournament and allowing Zachary to drive despite the objectively reasonable expectation of public danger his driving created) proximately caused Morton's injuries. 920 N.W.2d at 201, 203, 205. To answer this question, a jury need not decide whether forbidding Zachary from driving would have prevented the crash altogether. Allowing Dr. Arndt to testify to this opinion thus would risk sending the jury down an unnecessary and potentially incorrect path. Fed. R. Evid. 403.

To support his second opinion, Dr. Arndt included in his report a variety of supporting sub-opinions and information. This includes, for example, data regarding teenaged driving behaviors and risks and information regarding the impact of youth sports coaches. The parties' advance competing all-or-nothing arguments regarding this information's admissibility. Morton argues that Dr. Arndt may testify about all of it. Defendants argue he cannot properly testify about any of it. My answer at this stage is to provide the parties with a guiding principle: Dr. Arndt will be allowed to testify regarding information in this section of his report, provided it fits the case's facts. Fed. R. Evid. 702(a), and (d). For example, Dr. Arndt's opinion that inexperienced teenaged drivers are less adept at predicting and correctly responding to potentially hazardous situations fits the

case's facts.  That is what happened.  The lane-encroaching semi-truck forced Zachary, an inexperienced teenaged driver, to assess and respond to a life-threatening situation.  And Morton's theory—or one of them—is that Zachary's response was negligent.  Other information plainly does not fit the case's facts.  For example, teenaged drivers may be prone to making simple driving errors, are twice as likely to crash at night, or crash while driving to and from school, *see* ECF No. 130-1 at 31, but the record does not show that any of those things happened here.  Dr. Arndt will not be allowed to testify regarding this and other information that lacks any connection to the facts of this case.  Whether other specific information in Dr. Arndt's report fits the case's facts (or not) will otherwise be determined as necessary at trial.

3

Dr. Arndt's third opinion—that commercial transportation or adult-driven vehicles would have been safer than a student-driven vehicle—will be excluded.  It is not clear how this opinion might be relevant to showing negligence in light of how *Fenrich* approached the issue.  Recall that *Fenrich* identified several factors that prompted the court to conclude: "whether T.M.'s driving created an objectively reasonable expectation of danger to the public is at least a close call."  *Id.* at 205 (quotation omitted).  The factors the court identified concerned T.M.'s personal characteristics relevant to his driving abilities and the supervision—or, more correctly, the lack of supervision—he received from the cross-country team's coaches.  *Id.*  These factors did not include the availability of potentially safer transportation options.  *Id.*  This makes sense.  Whether a vehicle's driver poses a public danger ordinarily requires assessing the driver's characteristics, including any

22

instruction the driver has received.  Evidence showing the universe of potentially safer travel options—be they commercially operated buses, school vans, adult-driven vehicles, or even airplanes—does not help to assess this issue.  For this reason, Dr. Arndt's third opinion would not help the jury "to determine a fact in issue."  Fed. R. Evid. 702(a). Alternatively, the marginal relevance of evidence regarding the availability of potentially safer transportation options is substantially outweighed by the risks that it will confuse the jury and result in the needless presentation of cumulative evidence.  Fed. R. Evid. 403.  The jury will not be asked to decide whether safer travel options were available for the Park Christian basketball team's trip to the Wisconsin tournament.  If the jury hears that evidence, particularly from an expert, there exists a too substantial danger that the jury may decide the case on that basis.  And the universe of other travel options is large.  If admitted, it is no stretch to anticipate that testimony regarding these options will take considerable time, and it is difficult to know where to draw the line.  What if, for example, Defendants seek to cross-examine Dr. Arndt regarding the relative safety of different options based on available data?  The bottom line is that the admission of Dr. Arndt's third opinion is not justified in view of its peripheral relevance and the dangers its admission would pose.

C

Thomas N. Rush is a professional engineer who has, since obtaining his Master of Civil Engineering degree, "devoted [his] career to researching, studying, teaching, writing, and collaborating with other[s] to improve engineering methodologies for reliably gathering facts and data after collision events."  ECF No. 184 ¶ 5.  He has "personally completed over 1,000 collision reconstruction engineering investigations and

reconstructions of serious injury and fatality collisions." *Id.* ¶ 8. "Since 2008, [he has]

offered deposition or trial testimony in approximately 50 cases." *Id.* ¶ 7. Morton's counsel

retained Rush to conduct an engineering reconstruction analysis of the at-issue crash, and

Rush prepared a report in which he offers twelve numbered opinions:

1.   The Dodge was traveling eastbound on Interstate 94 as the 3rd vehicle in a 3-vehicle caravan.

2.   There were two eastbound travel lanes. The Dodge was traveling in the left lane while in the process of attempting to pass a slower tractor-trailer in the right lane, which had previously been passed by the other 2 vehicles ahead in the caravan.

3.   The Dodge driver made a steering maneuver to its left as part of an avoidance maneuver after the tractor-trailer began to move towards its left and towards the Dodge's lane.

4.   Prior to initiating the avoidance maneuver, the Dodge was traveling at an excessive speed of 77 mph. The posted speed limit was 70 mph.

5.   Roadway regulatory speed limits are selected by Transportation Engineers and Departments of Transportation based on the roadway geometry and the vehicle dynamics needs for reasonably safe operation. It takes greater time and space to brake from an excessive speed than from the posted speed and it is more difficult to maintain lateral position and avoid loss of directional control when traveling faster than the speed limit.

6.   The Dodge traveled off of the roadway to its left before steering back onto the roadway, overcorrecting with an additional steer to the left, losing directional control with clockwise yaw rotation (fishtailing), entering into the soil median while sliding sideways, and subsequently overturning with multiple rolls.

7.    Given the roadway context and relative positions of a slower tractor-trailer slowly moving laterally into the Dodge's travel lane, the appropriate initial response should have been to adjust speed and space to avoid a conflict, including reducing speed by easing off the gas pedal and using moderate steering to maintain lateral position on the paved surface. This would have eliminated any conflict with the tractor-trailer.

8.    Once the Dodge driver had steered to the left and departed from the travel lane, the appropriate response was for the driver to avoid the gas pedal and slow down before attempting to get back onto the pavement. This would have eliminated the loss of directional control and eventual overturning.

9.    The Dodge driver's response to the situation, instead, was to increase acceleration pedal application as the vehicle traveled off of the roadway and to the left, resulting in continued conflict with the tractor-trailer and departure from the travel lane. This action of continuing to accelerate was consistent with the Dodge driver attempting to continue to try and pass the tractor-trailer to keep up with the caravan, even after going off of the pavement.

10.   There was not a safety or dynamics advantage for accelerating to pass instead of braking to create space. The only potential advantage of the driver's selection of this acceleration maneuver was as an attempt to keep up with the speeding caravan ahead.

11.   Had the Dodge driver made the appropriate response to use moderate steering inputs while easing off of the gas pedal, instead of depressing the gas pedal further while inputting severe steering in multiple directions in sequence, the Dodge could have comfortably slowed down and maintained directional control before steering back onto the roadway. With proper and moderate steering, gas pedal, and brake pedal control, this crash would not have occurred, though the Dodge would have been separated from the caravan he was following.

> 12. Had the Dodge driver been traveling at or below the posted speed limit of 70 mph, instead of 77 mph, the Dodge driver could have utilized moderate braking to simply slow to match the speed of the tractor-trailer, and most likely would have been able to remain within the left lane behind the drifting tractor-trailer.

ECF No. 136-1 Ex. A at 3–4.

1

Defendants seek to exclude all of Rush's proffered testimony on the ground that it is speculative and "lacks the required specificity to satisfy the rigorous analysis applied to reconstruction of accidents." ECF No. 135 at 20–21. This argument is based primarily on Rush's deposition testimony. There, in response to questions posed by Defendants' lawyers concerning the factual bases underlying his opinions and about various hypothetical circumstances, Rush testified many times that his opinions anticipated "a range of possibilities." Evidently based on the frequency with which Rush testified that his opinions accounted for "a range of possibilities," Defendants argue that Rush's opinions are conjectural and that his testimony should be excluded entirely. Defendants argue as well that Rush's analysis "can also be likened to experimental evidence[]"—that is, opinions based on experiments that are so disconnected from the case's facts as to render the expert's opinions conjectural. *Id.* at 21.

Defendants' argument that Rush's "ranges of possibilities" deposition testimony shows his opinions are speculative is not persuasive. A cover-to-cover read of Rush's deposition shows that his references to a "range of possibilities" or "ranges of possibilities" conveyed Rush's view that his opinions would remain reasonable even if certain facts that

26

formed the basis for his opinions turned out to be somewhat different.  For example, Rush
was asked whether the position of the semi trailer's rear axles on the trailer might affect
his opinions.  Rush testified that he "did consider a variety of positions as part of [his]
analysis," that "specific dimensions would not make a difference."  ECF No. 136-1 Ex. B
at 26.  Rush continued on to explain with respect to this issue: "As far as my analysis is
concerned, I utilized a range of possibilities and formed my opinions based on the overall
range of possibilities."  *Id.* at 27.  The same is true with respect to the Kvalvog vehicle's
speed at the time of the crash.  On this issue, Rush testified:

> As far as my range of possibilities, I usually go up three or four
> miles an hour in each direction, or plus or minus, as far as when
> I'm doing my analysis and forming my opinions.
>
> That is what I am getting at.  I never just say it is exactly 77.
> I'm an engineer and always going to use a range of analyses.

*Id.* at 83.  In other words, Rush's testimony does not suggest that he lacked knowledge of
or speculated regarding the Kvalvog vehicle's speed.  His opinion is that, at the time of the
incident, the vehicle "was traveling at an excessive speed of 77 mph."  ECF No. 136-1
Ex. A at 3.  His deposition testimony reflects his belief that his opinions would remain
valid if the vehicle's actual speed were "three or four miles an hour" slower or faster than
that.  An expert's opinion does not become speculative because it accounts for variables
like these.  If anything, that kind of opinion seems more thorough.  Regardless, any flaws
Defendants may think lie in, or result from, the fact that Rush anticipated a range of
possible facts are better addressed on cross-examination at trial than through exclusion.

Defendants' argument that Rush's analysis compares to excludable experimental evidence is not persuasive, either.  Defendants cite two products-liability cases to support this argument: *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396 (8th Cir. 1994), and *Fusco v. General Motors Corp.*, 11 F.3d 259 (1st Cir. 1993).  Both cases involved the re-creation of suit-provoking events—a car battery explosion in *McKnight* and a car crash in *Fusco*—and the issue in both cases was whether the recreation was sufficiently similar to the actual conditions the plaintiffs encountered to justify their admission.  *McKnight*, 36 F.3d at 1400–05; *Fusco*, 11 F.3d at 263–64.  This case and Rush's opinions are quite different.  This is not a product-liability case.  Rush conducted no experiment.  And nothing in his report or deposition testimony shows—and Defendants do not seem to argue—that the evidence Rush evaluated in reaching his opinions did not fairly reflect the crash's conditions.

## 2

Failing complete exclusion, Defendants advance two alternative arguments.  *First*, Defendants seek to exclude specific opinions and evidence attempting to identify or depict the location of the Kvalvog truck in relation to the encroaching semi-trailer truck on the basis that these items are especially speculative.  ECF No. 135 at 22–26.  This aspect of Defendants' motion targets Figures 35, 36, and 37 to Rush's report, and simulations attached as Exhibit E and Exhibit F to Rush's rebuttal disclosures.  *Id.* at 24, 26.  The gist of Defendants' argument seems to be that these figures and simulations provide only "possibilities of what might have occurred" in the lead-up to the crash, *id.* at 24, implying that there is not a factual record sufficient to support Rush's depictions showing the

Kvalvog truck generally toward the semi-trailer's rear left when the semi began to encroach into the left lane, *see, e.g.*, ECF No. 136-1 Ex. A at 35–37.

This argument is not convincing for factual and legal reasons. Factually, Rush identified evidence in his deposition testimony that supports his assumption that the Kvalvog truck was near the semi-trailer's rear, including Morton and Schwandt's deposition testimony. ECF No. 136-1 Ex. B at 51–52; *see also id.* Ex. A at 32. Legally, as noted earlier, the "general rule" is that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner*, 259 F.3d at 929 (citation omitted). This attack on Rush's methodology and opinions is more appropriate for cross-examination at trial.

*Second*, Defendants seek to exclude parts of Rush's opinions numbered 9, 10, and 11 on the ground that they are human-factors opinions beyond Rush's accident-reconstruction expertise. ECF No. 135 at 27–29. In the challenged portion of each of these opinions, Rush suggests that Zachary's motivation for accelerating to pass the semi was to maintain contact with the "caravan"—that is, the vehicles driven by Coach Lee and Kerr. Rush asserts in his opinion 9 that Zachary's "action of continuing to accelerate was consistent with the Dodge driver attempting to continue to try and pass the tractor-trailer to keep up with the caravan." In opinion 10, Rush declares that "[t]he only potential advantage of [Zachary's] selection of this acceleration maneuver was as an attempt to keep up with the speeding caravan ahead." And in opinion 11, Rush maintains that, had Zachary

acted properly, his vehicle "would have been separated from the caravan he was following."  ECF No. 136-1 Ex. A at 3–4.

Exclusion of these parts of Rush's opinions is the better decision under Rule 702. Rush made clear in his deposition testimony that he is not a human-factors expert, that he had no intention of offering human-factors opinions, and that he had no intention or ability to identify Zachary's motivations or thinking underlying his actions leading up to the crash. *See, e.g.*, ECF No. 136-1 Ex. B at 59 ("I'm here to answer collision reconstruction opinions and I can tell you what was happening in that vehicle, but I have no opinions as to the extraordinary human factors circumstances that may or may not exist."); *id.* at 148 ("I have not -- I have not attempted to get into his head in any way.  What my opinion is is from a vehicle dynamics perspective, the action of continuing to press the gas pedal is consistent with trying to keep up, but, no, I don't know what was going through his head.  I don't have any opinions on that."); *id.* at 150 ("That is getting into human factors and I would say on that, that is outside my scope.  You would have to speak to the human factors expert.").  But the challenged portions of opinions 9, 10, and 11 go beyond accident reconstruction and attribute to Zachary a possible motive for his acceleration—*i.e.*, to maintain proximity to the vehicles driven by Coach Lee and Kerr.  In Rule 702's terms, these statements are beyond Rush's qualifications.  If he were qualified to advance these conclusions, Rush has not explained what principles or methods he applied to reach them. Logically, the idea that Zachary's acceleration could *only* have been the result of his motivation to maintain contact with the other two vehicles seems dubious.  Other reasons come quickly to mind: perhaps Zachary was just trying to outrun the encroaching semi;

perhaps he stepped on the gas pedal mistakenly.  The point is not that these are more likely causes, but that Rush has not done anything to rule them out.[5]

3

Finally, regardless of how their exclusion arguments are resolved, Defendants seek an order that would "prevent Mr. Rush from offering any undisclosed, new, or supplemental opinions as beyond the disclosure deadline, prohibited by law, and as prejudicial to Defendants."  ECF No. 135 at 29–30.  Defendants do not argue that Rush has actually offered undisclosed opinions in violation of the Rules or case-management orders. Their concern is that he might.  This request will be denied.  Absent some showing of a violation, there is nothing to be gained by entering the requested order.[6]

IV

Turn now to the summary judgment motions and the familiar standards governing their adjudication.  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*,

---

[5]    If these statements were not excluded under Rule 702, they would be excluded under Rule 403.  Suggesting that Zachary's acceleration is or is not "consistent" with one specific motive without addressing other motives or causes with which the acceleration might also be consistent seriously diminishes the probative value of Rush's testimony in this regard and would risk misleading the jury.

[6]    Defendants have filed a motion to exclude the testimony of a third expert, B. David Ridpath.  ECF Nos. 144, 145.  This motion will be the subject of a separate opinion and order that will be entered in due course.

477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### A

Defendants seek summary judgment on the merits of Morton's ordinary negligence claims.[7]  To recap, a negligence claim in Minnesota has four elements: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of that duty being the proximate cause of the injury." *Fenrich*, 920 N.W.2d at 201 (quotation omitted).  Defendants challenge the first and fourth elements, arguing that no reasonable jury could find they owed Morton a duty or that their actions proximately caused the crash.

### 1

Re-summarizing *Fenrich*'s analysis of the duty element, the general rule is that "a person does not owe a duty of care to another … if the harm is caused by a third party's conduct." *Id*. at 201 (quotation omitted).  The court determined that the school's conduct fit an exception to this general rule triggered when a "defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Id.* at 202 (quotation omitted).  Whether a risk had been created by the school's "own conduct" was trial-worthy, the court

---

[7]     To be precise, Morton and Defendants do not distinguish the negligence claim against Park Christian in Count One and the negligence claims against Coach Lee and Kerr in Count Two.  And Defendants do not separately challenge the vicarious liability claim in Count Four or the negligent supervision claim in Count Five; Defendants argue that these claims fail only because they derive from the assertedly non-trial-worthy direct negligence claims against Park Christian, Coach Lee, and Kerr.

explained, because "the school went beyond passive inaction by assuming supervision and control over its athletic team's trip to Sioux Falls." *Id.* at 203.  The question of the risk's foreseeability was genuinely disputed because "whether T.M.'s driving created an objectively reasonable expectation of danger to the public is at least a close call." *Id.* at 205 (quotation omitted).  The court identified several factors supporting this determination, each relating to the risks associated with T.M.'s driving, the lack of instruction and supervision he received from coaches in preparation for and during the trip, and the trip's length. *Id.* at 206.  With respect to the duty element as to Park Christian and Coach Lee, there is no meaningful daylight between *Fenrich* and this case.  Kerr, though, is different.

a

A reasonable jury could find on the basis of record evidence that Park Christian and Coach Lee "went beyond passive inaction by assuming supervision and control over" the basketball team's trip to Wisconsin Dells. *Id.* at 203.  The record shows that the Wisconsin Dells tournament occurred as part of the Park Christian basketball team's summer program. ECF No. 176-1 Ex. 2.  Coach Lee organized and ran the summer program.  ECF No. 160-1 Ex. K at 12–13; ECF No. 176-1 Exs. 1, 2; ECF No. 176-2 Exs. 7, 8.  The program was connected to the school in other ways.  For example, the program's schedule appeared on the Park Christian website.  ECF No. 176-5 Ex. 22.  And the program was conducted in the Park Christian gymnasium.  *Id.*  It is true that the summer program was voluntary (just like participation in the out-of-season cross-country meet in *Fenrich*), but there is evidence that Coach Lee encouraged players to participate.  ECF No. 160-1 Ex. C at 60–62, 139–140, 160–162, Ex. G at 160, Ex. L, Ex. K at 12–13.  Coach Lee identified the Wisconsin

33

Dells tournament and registered for the tournament as the "Park Christian School" team, with a check processed by the Park Christian business office and funded from the Park Christian boys' basketball account.  ECF No. 160-1 Ex. C at 80–82, 278–79, 296–97; ECF No. 161 Ex. N at 49; Ex. P at 23–24, 54–55, 59–62; Ex. V; Ex. W at 23–24; Ex. X; ECF No. 162 Ex. HH.  Though Nellermoe refused, Coach Lee's request for school transportation or vans reasonably may be construed to show that Coach Lee believed the tournament was a school-connected event.  ECF No. 176-7 Ex. 29 at 47, 148–49; ECF No. 160-1 Ex. C at 112–15, 137–38, 148–49; ECF No. 161 Ex. N at 47–48.

There is, however, no record evidence from which a jury might reasonably conclude that Kerr assumed supervision and control over the Wisconsin Dells trip.  Kerr was the Park Christian football team's head coach during the 2014 and 2015 seasons.  *See* ECF No. 155-1 Exs. 8, 9.  Kerr's 2014 football coaching contract ran from August 11 to November 30, 2014, and his 2015 football coaching contract ran from August 10 to November 14, 2015.  *Id*.  Kerr was not a teacher or a basketball coach at Park Christian School; in the summer of 2015, he worked as a real-estate broker.  ECF No. 155-1 Ex. 1 at 376, Ex. 3 at 14, Ex. 5 at 219, Ex. 6 at 340–41, Ex. 30 ¶ 2.  Kerr voluntarily drove his wife, his two sons (who were Park Christian basketball players), and two other players in Kerr's vehicle to the Wisconsin Dells tournament.  ECF No. 155-1 Ex. 5 at 219.

Morton advances several arguments to support his assertion that Kerr supervised and controlled the trip, but none justifies a trial on this question.  Morton points out that Kerr indicated on his football Coaching Letter of Assignment that he had read and reviewed the Park Christian Athletic Handbook and Minnesota State High School League Rules,

ECF No. 175 at 7 (citing ECF No. 176-4 Ex. 19 at 18; ECF No. 176-11 Ex. 46), and Kerr

was "obliged to comply with the Handbook," ECF No. 175 at 29.  These documents show

only that Kerr was obliged to comply with these handbooks' rules while under contract to

coach Park Christian's football team; that fact says nothing about his out-of-season conduct

or more particularly his control over the basketball team's Wisconsin Dells trip.  Morton

cites Coach Lee's testimony that "anybody going on that trip could have said that we're

done" and that Kerr "could have walked away from driving that day or cancelled his part

of [the trip]."  *Id*. at 18 (citing ECF No. 176-1 Ex. 3 at 265).  But people who are in charge

of an event ordinarily lack the ability to just walk away.  If anything, Kerr's ability to

abandon the trip (and his sons' participation in the tournament) shows that Kerr was a mere

participant.  Morton cites evidence tending to show that Kerr was an authority figure.  *See*

*id*. at 17–18, 33 (citing ECF No. 176-7 Ex. 26 at 71).  There is, however, a significant gap

between being "in control" of an event and being an "authority figure" present at an event.

Morton cites no authority to support the conclusion that evidence tending to show the latter

creates a genuine issue of fact as to the former.  Morton argues that Kerr went on the trip

with the expectation that he may need to coach a basketball game if Lee left the tournament

early.  *See id*. (citing ECF No. 176-4 Ex. 19  at 81).  Specifically, Kerr testified that there

were discussions "early on" that if Lee had to leave the tournament early, Kerr "would

have to sit on the bench for the last game."  *Id*.  Again, that Kerr had no certain coaching

responsibilities and that his need to coach depended on Coach Lee's plans confirm that

Coach Lee was in charge; these facts cannot be reasonably construed to show that Kerr was

in charge.  Finally, Morton argues that Kerr "set the speed" in his own vehicle, drove above

the posted speed limit, and then passed the semi while driving ahead of the Kvalvogs'
vehicle.  ECF No. 175 at 2–3, 29.  Morton cites no authority to support the conclusion that
Kerr's driving—either the fact that he drove or how he operated his vehicle—might show
that Kerr assumed supervision and control over the event.[8]  Kerr is entitled to summary
judgment on this ground.

b

Just as in *Fenrich*, the question of the risk's foreseeability as to Park Christian and
Coach Lee is trial-worthy because "whether [Zachary's] driving created an objectively
reasonable expectation of danger to the public is at least a close call."  *Fenrich*, 920 N.W.2d
at 205 (quotation omitted).  On this issue, there is significant overlap between the factors
the court cited in *Fenrich* and the record here.  There, T.M. "was a teenager (age 16) who
had been licensed for less than 6 months."  *Id.* at 206.  Here, Zachary was only two years
older and obtained his license "on his third try" a little more than two years before the
crash.  ECF No. 155-5 Ex. 21 at 41.  There, T.M. "was driving a lengthy distance with no
adults—only other teenagers—in the car."  *Fenrich*, 920 N.W.2d at 206.  We have both of
those facts here—a lengthy trip with no adults and only other teenagers in the truck.  ECF

---

[8]    Morton has defended the trial-worthiness of his negligence claims exclusively on
the third-party theory adopted in *Fenrich*.  In other words, Morton's theory is that Park
Christian, Coach Lee, and Kerr are liable for the negligence of a third party (Zachary) by
virtue of (1) their misfeasance—that is, their assumption of supervision and control over
the Wisconsin Dells trip—and (2) the foreseeability of the risk—that is, the objectively
reasonable expectation of danger to the public posed by Zachary's driving.  Morton has
neither cited authority establishing nor explained how Coach Lee and Kerr's driving bears
on this theory.  Morton has cited no legal authority to support the legal proposition that
Zachary might be excused for exceeding the speed limit because he was following two
other cars that were doing the same.

No. 163 Ex. LL.   Just as coaches provided essentially no specific instructions to T.M., *Fenrich*, 920 N.W.2d at 206, neither Coach Lee nor any other Park Christian representative provided Zachary with particular instructions or guidance either before or during the trip, ECF No. 176-3 Ex. 17 Resp. No. 18, Ex. 19 at 94.   It is true that *Fenrich* leaves room for argument about what number of these factors must be present to impose a duty and whether some of these factors are essential or perhaps more important than others.   920 N.W.2d at 213–14 (Anderson, J., dissenting).   But I conclude that distinguishing this case on the risk-foreseeability question would not be faithful to *Fenrich*'s here-binding majority opinion.

Park Christian's arguments regarding the duty element, echoed by Coach Lee, are not persuasive.   Highlighting Zachary's clean driving record, Park Christian argues that "it was not reasonably foreseeable . . . that Zachary driving to the Wisconsin tournament would result in a car accident, let alone an accident caused by [a] semi-truck forcing Zachary off the road."   ECF No. 159 at 22.   This argument seems at odds with *Fenrich*.   To determine that the duty question was trial-worthy, the court in *Fenrich* considered the same risks associated with teenaged driving, trip length, and lack of adult guidance present here. *Fenrich* did not consider the positive attributes of T.M.'s driving record; it did not balance those attributes against widely known risks or specific negative attributes.   Like Zachary, T.M. was a licensed driver, and for all we know, he had never been in an accident or received a traffic ticket before causing the crash at issue in *Fenrich*.   The court did not say, and that is the point.   I infer from *Fenrich* that it would be inappropriate to give those positive aspects of Zachary's driving record dispositive weight.   To be clear, there is no question that the record here includes evidence showing that Zachary was a safe,

responsible driver.  *See, e.g.*, ECF No. 162 Ex. AA at 24, 40–41; ECF No. 163 Ex. LL at 26–27, 29.  There also is no question this evidence will be admissible at trial to show that Zachary's driving did not create an objectively reasonable expectation of danger to the public.  *Fenrich*, 920 N.W.2d at 207.

2

The causation question boils down to determining whether a jury might reasonably conclude that Zachary's driving proximately caused the crash.  Morton's experts proffer non-excluded evidence that it did.   In his human-factors report, Arndt opines that inexperienced teenaged drivers are less adept at predicting, identifying, and correctly responding to potentially hazardous situations.  ECF No. 130-1 at 32, 35–39.  In his accident-reconstruction report, Rush opines that Zachary's "appropriate initial response" to the encroaching semi-truck should have been to ease off the gas pedal, slow down, and "us[e] moderate steering to maintain lateral position on the paved surface."  ECF No. 136-1 Ex. A at 3.  And Rush opines that, once Zachary "had steered to the left and departed from the travel lane, the appropriate response was . . . to . . . slow down before attempting to get back onto the pavement."  *Id.*  In Rush's opinion, Zachary did neither of these things, instead accelerating "as the vehicle traveled off the roadway and to the left, resulting in continued conflict with the tractor-trailer and departure from the travel lane."  *Id.*  During his deposition, Rush characterized Zachary's response as "poor."  ECF No. 136-1 Ex. B at 40, 60.  Rush identified as the "contributing factors" to the crash "the combination of the excessive speed, the poor avoidance response, as the well as the poor operation of the vehicle once it first went off the road."  *Id.* at 60.  In Rush's view, had Zachary "made the

38

appropriate response to use moderate steering inputs while easing off the gas pedal . . . the crash would not have occurred."  ECF No. 136-1 Ex. A at 4.

Defendants advance several arguments to challenge Morton's showing of causation. Defendants justifiably dispute Morton's suggestion that the decision to take the trip alone shows causation.  *See* ECF No. 186 at 38 (arguing that "if Defendants had canceled the trip, consistent with [school] policy, the accident would not have happened").  As Park Christian points out, this argument rests on an attenuated but-for causation theory rejected by the Minnesota Supreme Court.  *See, e.g.*, *Harpster v. Hetherington*, 512 N.W.2d 585, 586 (Minn. 1994).  The mere fact that Zachary was permitted to drive provided the occasion for the crash, not its cause.  *See id.*  Park Christian argues that Zachary's speeding cannot have been the crash's proximate cause because "[i]t is well-established in Minnesota that driving in excess of the speed limit is not grounds for automatic liability under the theory of negligence."  ECF No. 159 at 28.  True enough, but Morton does not seek to impose "automatic liability" based just on Zachary's speed.  Morton seeks to show causation based on Zachary's overall assertedly poor response to the encroaching semi, and Minnesota law does not preclude the jury from considering Zachary's speed as part of that.  Defendants argue that Morton's own testimony shows beyond dispute that Zachary was not negligent. In his deposition, Morton credited Zachary's driving, testifying at one point that Zachary's "evasive action . . . saved my life."  ECF No. 162 Ex. DD at 177–78.  Though Morton's testimony crediting Zachary's driving will be relevant at trial and may reasonably be construed to show that Zachary was not negligent, it is not a ground to enter summary judgment for Defendants when there is also record evidence (Dr. Arndt and Rush's

proffered opinions) tending to show that Zachary's response to the encroaching semi-truck was poor and unreasonable.  And no case has been cited establishing the rule that a personal-injury plaintiff's own testimony to the effect that a defendant's actions were not negligent alone triggers the entry of summary judgment against that plaintiff.  Finally, Defendants argue that Zachary's response should be excused as a matter of law under Minnesota's emergency rule.  *See Daly v. McFarland*, 812 N.W.2d 113, 123 (Minn. 2012) ("The emergency rule provides that one, suddenly confronted by a peril, through no fault of his own, who, in the attempt to escape, does not choose the best or safest way, should not be held negligent because of such choice, unless it was so hazardous that the ordinarily prudent person would not have made it under similar conditions." (quotations omitted)). Just as there are fact questions regarding whether Zachary's driving proximately caused the crash, whether this rule applies here, or excuses Zachary's conduct, also are fact questions for trial.

## B

The entry of summary judgment is appropriate against Morton's negligence per se claims against Coach Lee and Kerr.  Compl. ¶¶ 76–81.  Morton alleges that Lee and Kerr "committed negligence per se when they violated the speed limit in violation of Minnesota Statute § 169.14, Subd. 2."  *Id.* ¶ 78.  "Negligence per se is a form of ordinary negligence that results from violation of a statute."  *Anderson v. Minn. Dep't of Nat. Res.*, 693 N.W.2d 181, 189 (Minn. 2005) (quoting *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981)). "The only difference [between negligence and negligence per se] is that the measure of legal duty for actual negligence is determined upon common-law principles[,] while the

measure of duty for negligence per se is fixed by the statute, so that its violation constitutes conclusive evidence of negligence." *Kronzer v. First Nat'l Bank of Minneapolis*, 235 N.W.2d 187, 192 (Minn. 1975). If Coach Lee and Kerr's driving were relevant to Morton's claim, Minnesota excepts traffic-regulation violations from negligence per se. *See* Minn. Stat. § 169.96(b) ("In all civil actions, a violation of any of the provisions of [Chapter 169], by either or any of the parties to such action or actions shall not be negligence per se but shall be prima facie evidence of negligence only."); *see also Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 419 (8th Cir. 2016).

C

The entry of summary judgment is also appropriate with respect to Morton's breach-of-fiduciary-duty claim against Park Christian School. Compl. ¶¶ 92–96. In Minnesota, a breach-of-fiduciary-duty claim has four elements: "[1] duty, [2] breach, [3] causation, and [4] damages." *Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019). "A fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence." *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 330–31 (Minn. Ct. App. 2007) (citing *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985)). Some relationships are fiduciary per se. "Per se fiduciary relationships include trustee-beneficiary, attorney-client, business partnerships, director-corporation, officer-corporation, and husband-wife." *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009). Apart from these per se fiduciary relationships, a "de facto" fiduciary relationship may arise from a particular set of facts. "Where the parties' arrangement is

41

not of a type that has been designated a per se fiduciary relationship, the general rule in Minnesota is that it may be found to constitute a de facto fiduciary relationship only where certain 'special circumstances' are present." *Carlson, Inc. v. Int'l Bus. Machs. Corp*., No. 10-cv-3410 (JNE/TNL), 2013 WL 6007508, at \*6 (D. Minn. Nov. 13, 2013).   Several considerations are relevant to determining whether such "special circumstances" exist. These include whether "one party place[d] its trust and confidence in the other," whether "one of the parties enjoyed superior or excessive influence over the other party," whether one party relied on the other party's "superior knowledge," whether there was "[d]isparity in business experience and invited confidence," and "whether the alleged fiduciary knew of the dependent party's ignorance" or lack of understanding regarding the at-issue transaction or transactions.   4 Minn. Dist. Judges Ass'n, Minnesota Practice, Jury Instruction Guides—Civil, JIG 23.10 (6th ed. 2021) (citations omitted); *see also Carlson, Inc*., 2013 WL 6007508, at \*6 (recognizing that special circumstances establishing a de facto fiduciary relationship may be based on "a wide disparity of experience and knowledge between the parties, uneven access to information and resources, invited confidences, and the surrender of financial control").   Minnesota courts are reluctant "to sustain a cause of action for breach of a de facto fiduciary duty when the cause of action merely disguises another, more apposite but unavailing legal theory."   *Swenson*, 764 N.W.2d at 603–04.

To show the presence of a fiduciary duty, Morton argues only that Morton "was a teenage boy who moved across the country and put his trust and confidence in PCS, a Christian school which recruited him as a student athlete."   ECF No. 186 at 39.   This is not

persuasive. Morton does not distinguish between a per se or de facto fiduciary relationship. The relationship between a student (or a recruit) and a school seems nothing like the relationships the Minnesota courts have found to be per se fiduciary. Morton cites no case finding a de facto fiduciary relationship on facts like those presented here. Nor does he address the various considerations necessary to identifying the presence of a de facto fiduciary relationship. The lack of meaningful argument on this point alone warrants entry of summary judgment against this claim. *See Gilpatrick v. Frakes*, 997 F.3d 1258, 1259–60 (8th Cir. 2021) (citing cases). Regardless, a thorough review of the record shows no evidence that might permit a reasonable juror to find that Park Christian owed Morton a de facto fiduciary duty.

D

Coach Lee and Kerr argue that they are entitled to summary judgment under a Minnesota Statute limiting the extent of civil liability for agents of tax-exempt organizations. The statute, Minn. Stat. § 317A.257, provides generally that:

> a person who serves without compensation as a director, officer, trustee, member, or agent of an organization exempt from state income taxation … is not civilly liable for an act or omission by that person if the act or omission was in good faith, was within the scope of the person's responsibilities as a director, officer, trustee, member, [or] agent … of the organization, and did not constitute willful or reckless misconduct.

Minn. Stat. § 317A.257, subd. 1. The statute, however, "does not limit an individual's liability for physical injury to the person of another or for wrongful death that is personally

43

and directly caused by the individual." *Id.*, subd. 2; *see Hogan v. Brass*, 957 N.W.2d 106, 109 (Minn. Ct. App. 2021), *review denied* (May 26, 2021).

The parties' positions narrow the issues for decision under this statute. Coach Lee and Kerr argue that: (1) each is an "agent" of Park Christian; (2) Park Christian is exempt from state income taxation in the relevant way; (3) each served without compensation in connection with the Wisconsin Dells trip; (4) each acted in "good faith" in connection with the trip; (5) each acted "within the scope of [their] responsibilities as [an] … agent" of Park Christian in connection with the trip; (6) their acts in connection with that trip "did not constitute willful or reckless misconduct"; and (7) neither of them "personally and directly caused" Morton's injuries. *See* ECF No. 170 at 18–25; ECF No. 153 at 33–35. Morton focuses his opposition on just two of these elements. He disputes the third element, arguing that Coach Lee and Kerr were compensated because the Wisconsin Dells trip was within the scope of their employment. ECF No. 193 at 38–39; ECF No. 185 at 32–33. And Morton disputes the final element, arguing that Lee and Kerr "personally and directly" caused his injuries. *Id.*[9]

No reasonable juror could find that Coach Lee and Kerr served with compensation in the sense intended by § 317A.257. Morton does not challenge Lee and Kerr's assertion that they were acting as Park Christian's agents in connection with the Wisconsin Dells tournament trip. Morton identifies no evidence showing that either Lee or Kerr received

---

[9]    Morton's decision not to challenge in his opposition briefs Lee and Kerr's showing of the remaining elements of § 317A.257 immunity means he has waived those issues. *Gelschus v. Hogen*, 47 F.4th 679, 687 (8th Cir. 2022) (citation omitted).

compensation specifically in consideration for the trip. So, for example, there is no evidence that Park Christian paid Coach Lee any amount specifically for the time he spent organizing the trip, and there is no evidence suggesting that Park Christian would have paid Lee for the time he spent coaching at the tournament. Neither Lee nor Kerr was under contract when the trip occurred. ECF No. 176-11 Exs. 38, 39; ECF No. 155-1 Exs. 8, 9. Their contracts reflect that compensation would have been paid only during each season's duration and included no term requiring either Lee or Kerr to serve outside the contracted-for season. *See* ECF No. 176-11 Exs. 38, 39, 46; ECF No. 155-1 Ex. 9. Morton cites no evidence—written or otherwise—showing that Lee and Kerr were required to participate in out-of-season activities like the Wisconsin Dells tournament. Morton argues essentially that Lee and Kerr's tournament-connected activities were the same kind of activities each engaged in during their teams' regular seasons. *See* ECF No. 185 at 33. This argument connects Lee and Kerr's tournament-connected work to Park Christian— that is, it shows the presence of an agency relationship—but it does not say anything about whether Lee and Kerr were compensated specifically in connection with the Wisconsin Dells tournament. Importantly, Morton cites no legal authority for the proposition that a nonprofit agent's contracted-for compensation during one part of the year—here, the football and basketball seasons—must be attributed to other times or work done outside the season for purposes of Minn. Stat. § 317A.257. And he cites no record evidence that might support the factual conclusion that Lee and Kerr's contracted-for compensation was intended to apply to out-of-season activities like the Wisconsin Dells tournament.

Unsettled legal and factual questions, however, preclude a determination that Lee and Kerr did not "personally and directly cause[]" Morton's injuries within the meaning of Minn. Stat. § 317A.257, subd. 2.  No Minnesota case has been cited or located defining what it means to "personally and directly cause" an injury, and the briefing includes no analysis of legislative intent behind the statute. *See* Minn. Stat. § 645.16 (1)–(8); *Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013).  Independent research has yielded no certain or very trustworthy answers.  For example, some Minnesota authorities treat "direct" causation as synonymous with proximate cause.  4 Minn. Dist. Judges Ass'n, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 27.10 (6th ed. 2021).  As the Guide explains: "'Direct cause' has been selected rather than 'proximate cause.' 'Proximate' is a term that may be meaningful to lawyers because of familiarity with the concept, but it is not so understood by jurors.  'Proximate' often confuses, rather than enlightens, the trier of fact.'" *Id.*; *see also George v. Estate of Baker*, 724 N.W.2d 1, 10–11 (Minn. 2006) ("Minnesota applies the substantial factor test for causation.  The negligent act is a direct, or proximate, cause of harm if the act was a substantial factor in the harm's occurrence.")  In other words, these authorities show that the legislature's use of "directly" in § 317A.257, subd. 2, likely does not intend to imply something other than proximate cause.  It is true that the statute also uses the word "personally" to describe the immunity's exception, and some courts have described the "personal" infliction of an injury to mean something more than mere proximate cause. *See, e.g.*, *Dahlberg v. Sandor*, No. 1:11-cv-00967-LJO, 2011 WL 5241148, *7 (E.D. Cal. Nov. 1, 2011), *aff'd sub nom. Dahlberg v. Cash*, 565 F. App'x 657 (9th Cir. 2014) ("To personally inflict injury, the actor

must do more than take some direct action which proximately causes injury. The defendant must directly, personally, himself inflict the injury." (cleaned up)). But this case and others like it have not been addressed in the briefing, and it is not clear how some more-than-proximate-cause standard might interact with the standards the Minnesota Supreme Court described in *Fenrich* or how it might apply to this case's facts. Better to leave these questions to be decided on a motion under Federal Rule of Civil Procedure 50.

V

Morton seeks summary judgment on two issues. First, based on issue-preclusion principles, Morton argues that "there is no genuine material dispute that the trip was a school activity," and that this finding should be made "as a matter of law." ECF No. 175 at 4. For this argument, Morton relies on the jury's finding in a state-court suit brought against Park Christian and Coach Lee by Zachary and Connor Kvalvog's parents, Raymond and Katherine. *See Kvalvog v. Lee*, Nos. A20-0693, A20-1587, 2021 WL 3027269 (Minn. Ct. App. July 19, 2021), *review denied*, (Minn. Sept. 30, 2021). There, the jury answered "YES" to a special-verdict-form question asking: "Was the Wisconsin Dells tournament trip a school activity?" ECF No. 176-11 Ex. 43 at 1. Second, Morton argues that summary judgment should be entered in his favor on the "duty" element of his negligence claims. *Id.* These arguments are not persuasive.

"Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts 'must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Finstad v. Beresford Bancorporation, Inc.*, 831 F.3d 1009, 1013 (8th Cir. 2016) (quoting *Migra v. Warren City*

47

*Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).  "Under Minnesota law, collateral estoppel is appropriate when the following four elements are met: (1) the issue [is] identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue."  *Ill. Farmers Ins. Co. v. Reed*, 662 N.W.2d 529, 531–32 (Minn. 2003) (quotation omitted).  Regarding the first element, "[t]he issue on which collateral estoppel is to be applied must be the same as that adjudicated in the prior action and it must have been necessary and essential to the resulting judgment in that action."  *Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn. Ct. App. 2004) (citing *Ellis v. Minneapolis Comm'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn. 1982), and *Hauser v. Mealey*, 263 N.W.2d 803, 808 (Minn. 1978)).  "The issue must have been distinctly contested and directly determined in the earlier adjudication for collateral estoppel to apply."  *Id.* at 837–38.  Issue preclusion in Minnesota is not "rigidly applied," rather, "the focus is on whether its application would work an injustice on the party against whom estoppel is urged."  *Falgren v. Bd. of Teaching*, 545 N.W.2d 901, 905 (Minn. 1996) (quoting *Johnson v. Consol. Freightways, Inc.*, 420 N.W.2d 608, 613–14 (Minn. 1988)).  "The party asserting collateral estoppel has the burden to establish that 'the issue was actually presented and necessarily determined in the earlier action.'"  *Mach v. Wells Concrete Prods. Co.*, 866 N.W.2d 921, 927 (Minn. 2015) (quoting *Lange v. City of Byron*, 255 N.W.2d 226, 228 (Minn. 1977)).

Morton's argument fails on these principles.  Though the school-activity issue was decided by the jury in the state-court action, this issue was not "necessary and essential" to

48

the resulting judgment, which found the "John Doe" semi-truck driver negligent and the sole cause of the accident.  *See Hauschildt*, 686 N.W.2d at 837; *see also Marshall v. Inn on Madeline Island*, 631 N.W.2d 113, 121 (Minn. Ct. App. 2001).  Once all fault was assessed to that unidentified semi-truck driver, the jury's "school-activity" finding became unessential, and neither defendant to the state-court action had any incentive to appeal the verdict in their favor.

Morton's request for summary judgment on the duty question is not persuasive because the issue is the subject of several genuine, material fact disputes.  As explained earlier in the context of analyzing Defendants' motions, whether Park Christian and Coach Lee assumed supervision and control over the Wisconsin Dells tournament and trip is genuinely disputed.  The same goes for whether Zachary's driving created an objectively reasonable expectation of danger to the public.  If that issue was "at least a close call" in *Fenrich*, 920 N.W.2d at 205, then it is a close call here.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Defendant Christopher Nellermoe's Motion for Summary Judgment [ECF No. 119] is **DENIED AS MOOT**.

2.      Defendants' Joint Motion to Exclude Expert Testimony of Dr. Arndt [ECF No. 127] is **GRANTED IN PART** and **DENIED IN PART** as explained in Part III.B., above.

3.      Defendants' Joint Motion to Exclude Expert Testimony of Thomas Rush [ECF No. 133] is **GRANTED IN PART** and **DENIED IN PART** as explained in Part III.C., above.

4.      Defendant Timothy Kerr's Motion for Summary Judgment [ECF No. 151] is **GRANTED**.

5.      Defendant Park Christian School, Inc.'s Motion for Summary Judgment [ECF No. 157] is **GRANTED IN PART** and **DENIED IN PART**.   The Motion is **GRANTED** with respect to the claims asserted in Count Six of the Complaint.  The Motion is otherwise **DENIED**.

6.      Defendant Joshua Lee's Motion for Summary Judgment [ECF No. 168] is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Count Three of the Complaint.  The Motion is otherwise **DENIED**.

7.      Plaintiff Jimmy Morton's Motion for Summary Judgment [ECF No. 173] is **DENIED**.

Dated: October 3, 2022                          s/ Eric C. Tostrud
                                                _____
                                                Eric C. Tostrud
                                                United States District Court