UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jimmy Morton,                                                File No. 19-cv-3134 (ECT/LIB)

    Plaintiff,

v.                                                                         **OPINION AND ORDER**

Park Christian School and Joshua Lee,

    Defendants.

---

Lori A. Johnson, Andrew D. Parker, and Jordon Greenlee, Parker Daniels Kibort LLC, Minneapolis, MN, attorneys for Plaintiff Jimmy Morton.

Amanda M. Cialkowski, Brian N. Johnson, Kelly P. Magnus, Leah N. Kippola-Friske, Tammy M. Reno, and Matthew C. Murphy, Nilan Johnson Lewis PA, Minneapolis, MN, attorneys for Defendant Park Christian School.

Briana Gornick and William L. Moran, HAWS-KM, P.A., St. Paul, MN, attorneys for Defendant Joshua Lee.

---

Defendants seek to exclude the testimony of Plaintiff Jimmy Morton's rebuttal expert, B. David Ridpath, Ed.D. Dr. Ridpath's proffered testimony concerns Morton's damages-related claim that, if not for injuries he sustained in the June 2015 motor vehicle accident that underlies his claims, Morton would have obtained a college athletic scholarship and could have been an Olympic athlete.[1] The motion will be granted in part and denied in part.

---

[1] The June 2015 motor vehicle accident and Morton's claims are described in the Opinion and Order dated October 3, 2022, addressing summary-judgment and other motions. ECF No. 213. Familiarity with that Opinion and Order is presumed here.

I

A

Morton identified Dr. Ridpath as a rebuttal expert[2] to Defendants' expert Gary Wilson, and a summary of Wilson's expert opinion helps frame Dr. Ridpath's rebuttal opinions. Wilson was a Division I track and field coach at the University of Minnesota from 1985 to 2013. Wilson offered an opinion addressing Morton's damages-related claim that, had he not sustained injuries in the June 2015 motor vehicle accident, Morton could have obtained a college athletic scholarship and become an Olympic athlete. *See* ECF No. 148-1 Ex. 1 at 12–13.

Wilson provided background on the collegiate athletic recruiting process and how NCAA Division I and II coaches approach that process. ECF No. 148-1 Ex. 4 at 2–3. After reviewing Morton's track and field records, Wilson concluded that "it is clear that Mr. Morton has very good athletic ability" that "likely got him noticed by a number of Division I and Division II college coaches." *Id*. at 4. Yet Wilson opined that, even if Morton was "invited to apply to several Division I universities" before the June 2015 accident,[3] this did

---

[2]  Morton designated Dr. Ridpath only as a rebuttal expert. *See* ECF No. 147 at 4 n.3; ECF No. 148-1 Ex. 9; ECF No. 198 at 2 n.2. Under the then-operative Pretrial Scheduling Order, Morton was required to disclose expert witnesses for his case-in-chief by April 5, 2021, and rebuttal witnesses by June 17, 2021. *See* ECF Nos. 38, 42. Morton disclosed Dr. Ridpath as a rebuttal expert on June 17, 2021. *See* ECF No. 148-1 Ex. 9. Morton never moved to re-designate Dr. Ridpath, nor has he attempted to show the good cause that would be required to modify the scheduling order to do so. Accordingly, Dr. Ridpath will only be allowed to testify as a rebuttal witness. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006).

[3]  Morton's interrogatory answers stated that before the crash, "Plaintiff was invited to apply to several Division One universities and play for their basketball and/or track and

not mean that Morton had offers of admission or athletic aid at these schools. *Id*. Wilson described a variety of procedures an athlete would need to complete before possibly being offered admission or athletic aid to a Division I or Division II college—including completing a recruiting questionnaire, registering for the NCAA Clearinghouse, providing ACT or SAT scores, and providing academic records. *Id*. Wilson also stated that Morton "twice began the application process to Moorhead State in Minnesota but never completed either application." *Id*.; *see also* ECF No. 148-1 Ex. 8.

Wilson then opined that Morton did not meet the academic standards or follow through with the procedural requirements necessary to be accepted or receive an athletic scholarship at any Division I or Division II school. *Id*. at 4–5. In Wilson's opinion, Morton did not meet the academic standards either before or after the June 2015 Accident, nor did he register for the NCAA Clearinghouse. *Id*. at 5. Wilson concluded that he "would not have offered [Morton] a tender because he did not follow through on the basics of getting himself accepted." *Id*.

Wilson further concluded that had the accident not occurred, Morton would not have become an Olympic high jumper for a number of reasons, including: (1) Morton's poor academic record;[4] (2) his failure to register for the NCAA Clearing House; (3) his inability

---

field teams, including, without limitation, Texas Christian University, Kansas State University, Mississippi State University, and Jackson State University." *See* ECF No. 148-1 Ex. 1 at 12–13.

[4]  As a junior, Morton scored a 12 on his ACT, then brought the score up to 14 in February 2016. At the end of his senior year, Morton had a 1.94 grade point average. *See* ECF No. 148-1 Ex. 5.

to get a junior college degree and perhaps transfer to a Division I or Division II school; (4) his failure to follow through with his partial scholarship at Minnesota State University–Moorhead ("MSU-Moorhead"); and (5) his likely inability to obtain the independent financial and training resources required of a prospective Olympic athlete who does not go to college. *Id*. at 5–7.

Wilson further opined on the range of scholarship money a high jumper would receive at a Division I or Division II college or university. *Id*. at 7–8. Wilson concluded that the 15%-level ($3,000) athletic scholarship offered to Morton from MSU-Moorhead was "appropriate" because "a coach may take a slight risk (due to less scholarship money being available)" because "not much money is lost" if the athlete does not make it.[5] *Id*. at 8. Wilson opined, however, that "even this [MSU-Moorhead] offer would have been concerning to [him]" because "most coaches will not bet on [a] 7-footer with poor high school grades by giving them a significant amount of scholarship money." *Id*. Finally, Wilson described the academic threshold required to retain an athletic scholarship and eligibility at a Division I or Division II college or university. *Id*.

B

That brings us to Morton's rebuttal expert, Dr. Ridpath. Dr. Ridpath is a tenured Associate Professor of Sports Administration and Facility Management at the College of

---

[5]   In November 2017—two years after the accident—Morton was offered a $3,000 athletic scholarship and signed a Letter of Intent to participate in Men's Track and Field at MSU-Moorhead for the 2018-19 academic year. ECF No. 148-1 Ex. 8. The scholarship offer was not effective unless Morton was accepted for admission at MSU-Moorhead. *Id*. Morton never completed the application process, so he was never accepted. *Id*.

Business at Ohio University in Athens, Ohio. ECF 148-1 Ex. 7 at 2. His "primary research interests lie in the governance of intercollegiate athletics, rules, regulations and NCAA bylaws, enforcement and infractions, academic and athlete eligibility standards and regulatory compliance." *Id*. Dr. Ridpath earned a Masters of Sports Administration and Facility Management degree from Ohio University in 1995, and he received a Doctor of Education in Higher Education Administration from West Virginia University in May 2002. *Id*. at 2–3. Dr. Ridpath has limited coaching experience, having served as an assistant wrestling coach at Ohio University during 1994–95. *Id.* at 2.

Since 1995, Dr. Ridpath has served in a number of positions related to collegiate athletic eligibility and compliance. Dr. Ridpath worked in the athletic department at Weber State University in Ogden, Utah, from 1995–1997, where he served as Assistant Director of Marketing and Promotions, Director of Internal Operations, and Director of Compliance. *Id*. at 2. At Weber State, Dr. Ridpath oversaw athletic eligibility and chaired the university compliance committee that was involved with ultimately approving athletic eligibility. *Id*. He also investigated and reported conference and NCAA violations regarding the Weber State Men's Basketball program. *Id*. Dr. Ridpath then spent seven years at Marshall University in Huntington, West Virginia, where he served as an Adjunct Professor of Sport Management and Marketing, Director of Judicial Programs, and Assistant Athletic Director for Compliance and Student Services. *Id*. There, Dr. Ridpath was "involved in the athletic eligibility process to include admission of athletes to the university and oversight of the National Letter of Intent (NLI) program." *Id*. Before returning to Ohio University in his

5

current capacity, Dr. Ridpath spent two years directing graduate sports administration at Mississippi State University. *Id*. at 3.

Dr. Ridpath offers a number of rebuttal opinions, all of which lead to his ultimate opinion that "based on athletic ability alone, there was a pathway for Morton to compete in Track & Field and/or basketball at the NCAA Division I or II level and receive athletic scholarship aid to do so." *Id*. at 12. Dr. Ridpath opines that these opportunities are no longer available to Morton because of the June 2015 accident. *Id*. at 6.

Dr. Ridpath's opinion begins with his impressions of Park Christian School:

> PCS is a private Christian-based school. Consistent with many private schools in America, these schools (often religiously affiliated) will often recruit/encourage outstanding athletes to enroll for an education and a chance to compete at a high level athletically. In turn, many of these schools have become national athletic powerhouses, specifically in the sport of boys' basketball. This is one sport which Morton, a talented athlete at both basketball and track, was primarily recruited to PCS for because of its excellent basketball program and a chance at better education outcomes than the public school system of Mississippi offered him.
>
> This is typical as numerous parochial and other private high schools nationwide are noted for bringing athletically talented kids out of tough home and school situations and providing potential better outcomes and a pathway to college.

*Id*. at 4. Dr. Ridpath then opines that Morton was a "recruited high school athlete" at Park Christian School whose "athletic value and utility" were "rated as high and desirable." *Id*. at 7. Dr. Ridpath states that Morton "set numerous personal and Mississippi State High School records in the high jump and triple jump" and that he "was also a very good basketball player with potential to play beyond high school at the college level." *Id*. at 6.

6

Dr. Ridpath reasons that "Morton's athletic utility is undisputed" because Park Christian School "actively pursued" Morton, "demonstrat[ing] the athletic value and ability that Morton had at the time and likely in the future." *Id*. at 6–7.  As Dr. Ridpath describes it:

> Administrators and the head basketball coach at PCS started calling [Morton's mother] and saying they would cover tuition and other expenses. During practices, Principal Nellermoe asked Morton about his grades, so it is more likely than not that PCS knew that Morton would need some help academically, but that PCS also could provide that needed assistance. Schools like PCS that often recruit academically unprepared athletes are familiar with and well equipped to provide the academic remediation necessary to assist as a way to better prepare them for college and a potential scholarship.
>
> . . .
>
> [Morton] was actively pursued by Park Christian via his cousin Alonzo Moton.  That connection led Alonzo Moton to advertise Morton and his athletic utility to PCS as a way to give him a better chance to succeed academically and athletically outside Mississippi and its substandard public education system.  It is common for private schools, specifically religiously affiliated ones, to recruit athletes nationwide and build athletic powerhouses that often result in those athletes receiving college athletic scholarship offers.  According to Moton, Head Coach Joshua Lee, Assistant Principal Michael Levang, and Athletic Director Richelle Richardson all actively recruited Morton to come to PCS prior to the start of his senior year and play summer basketball to be better prepared for the regular season.
>
> Consequently, Morton was a recruited high school athlete by any definition. As such, his athletic value and utility was rated as high and desirable, on this basis alone.  Despite this practice being impermissible by all 50 state High School Athletic and Activity Associations, it is a rule that is rarely enforced, as in this situation. . . .  It is doubtful that PCS would have pursued him as actively but for his athletic utility and ability.  By this facet alone, it demonstrates the athletic value and ability that Morton had at the time and likely in the future.

7

*Id*. at 5–7.

Dr. Ridpath goes on to describe how, in his opinion, Morton's injuries from the June 2015 accident "derailed [Morton's] prospective athletic career":

> Prior to the accident, he jumped seven feet in the high jump, which is comparable to high-level college athletes and certainly something that college athletic recruiters would notice. Consequently, several NCAA Division I and II colleges were recruiting him for track and field after his junior year. He was also an excellent basketball player, with a promising future in college basketball and possibly beyond. Sadly, Morton continues to suffer from the traumatic brain injury and has been permanently disfigured. The accident has changed his brain functioning and the course of his life and certainly has made a future in high-level athletic competition impossible.

*Id*. at 6.

From this background, Dr. Ridpath concludes "with a high degree of professional certainty" that before the June 2015 accident, it "was not only possible; it was probable" that Morton "could have participated in intercollegiate athletics, been academically eligible and by extension potentially receive an athletic scholarship in the NCAA Division I or II level." *Id*. at 7. Dr. Ridpath further concludes "that the accident significantly and wholly damaged any chance for Morton to have an athletic career his senior year in High School and beyond." *Id*. at 8. Then, recognizing that Morton's ACT score and his GPA were "less than ideal for immediate intercollegiate athletic eligibility based on his academic record up until that point in time," Dr. Ridpath opines that "[c]onsidering [Morton] was coming from a poor educational environment in Mississippi, it is not a stretch to conclude that he could have improved his grade point average and standardized test scores during his senior year,

8

with the academic structure and support from a small private school like PCS." *Id*. at 8. Dr. Ridpath offers that he "personally saw dozens of athletes who had scores similar to Morton's that were able to attain full qualifier or partial qualifier status in accordance with NCAA initial academic eligibility benchmarks during their senior year." *Id*. at 9.

Dr. Ridpath also describes other potential paths that Morton may have taken to a collegiate athletic scholarship, had his academics not improved. In particular, Dr. Ridpath suggests the possibility of an Initial Eligibility Waiver if Morton fell short of academic requirements. *Id.* at 9. Dr. Ridpath further opines that "it is possible Morton has an undiagnosed [certified learning disability], which could have been uncovered at PCS." *Id*. at 10. Finally, Dr. Ridpath posits that even if Morton was academically ineligible to compete in college as a freshman, he "would have had the option to attend college as an academic non-qualifier or an academic redshirt," where he could have received "needed academic remediation." *Id*. Dr. Ridpath thus concludes that "many NCAA Division I and II coaches would have tendered an athletic scholarship offer to Morton, irrespective of [his] academic challenges because of the multiple aforementioned possible pathways." *Id*. at 11. Dr. Ridpath concludes that:

> [J]ust because one is academic[ally] unprepared and academically deficient prior to their senior year in high school, or candidly after their senior year, the pathway and probability of competing athletically in college and receiving a scholarship is not lessened. The avenue and process may change, but the assertion that Morton somehow academically disqualified himself regardless of the circumstances of the accident is simply an incorrect opinion and not based on the facts or reality of intercollegiate athletics in America.

9

> *Specifically, it is my opinion that based on athletic ability alone, there was a pathway for Morton to compete in Track & Field and/or basketball at the NCAA Division I or II level and receive athletic scholarship aid to do so.* There was also a significant amount of time to enhance and improve his academic standing during his senior year in the structured environment that PCS had, but was not available but for the accident. . . . Despite Morton's substandard academic credentials at the end of his junior year, he absolutely had many avenues to compete in athletics and receive athletically related financial aid while pursuing a college degree prior to the auto accident on June 23, 2015.

*Id*. at 12 (emphasis in original).

## II

### A

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

See also *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "District courts have wide latitude in determining whether an expert's testimony is reliable." *Olson v. Ford*

10

*Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007).  There are a number of factors courts may consider in determining whether an expert's testimony is the product of "reliable principles and methods," including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006).  "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands.  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).  As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs.  *Id.*  "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."  *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted).  But the court must exclude an expert's opinion if it "is so fundamentally unsupported that it can offer no assistance to the jury."  *Id.* at 929–30 (quotation omitted).  "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."  *Marmo*, 457 F.3d at 757.  Furthermore, "under *Daubert* and Rule 403 of the Federal Rules of Evidence, the probative

11

value of the expert testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." *United States v. Solorio-Tafolla*, 324 F.3d 964, 966 (8th Cir. 2003) .

B

Defendants seek to exclude Dr. Ridpath's testimony on a variety of grounds, though their position appears to have changed a bit over the course of briefing. Defendants initially sought to have "any testimony" from Dr. Ridpath excluded, asserting outright that he "should not be allowed to testify." *See* ECF No. 147 at 1, 18. But Defendants' position appears to have softened. In their reply brief, Defendants make clear that they do not object to Dr. Ridpath opining on "the academic requirements and eligibility procedures of the NCAA, and the mechanism available to assist athletes with meeting the academic and procedural requirements." ECF No. 198 at 2. Accordingly, insofar as Defendants' motion initially sought to exclude Dr. Ridpath's testimony regarding NCAA academic requirements and eligibility procedures, and the mechanism available to assist athletes with meeting the academic and procedural requirements, Defendants' motion will be denied as moot.

1

Defendants' primary dispute is with Dr. Ridpath's opinion about "the likelihood that Morton's athletic ability would have prompted a university to assist [Morton] in" obtaining a scholarship. ECF No. 198 at 2. The gist of Defendants' argument is that Dr. Ridpath is not qualified to offer expert opinion on the topics of Morton's athletic ability in basketball or track and field because Dr. Ridpath has no experience or expertise with these two sports,

12

and because Dr. Ridpath did nothing to educate himself on Morton's athletic ability—such as interviewing Morton, discussing Morton's situation with any collegiate track and field or basketball coaches, watching films of Morton competing, gauging Morton's commitment in competing at the Division I or Division II level, or even reviewing Morton's depositions from this case or prior litigation. ECF No. 147 at 5, 10–11. Absent any such expertise or knowledge, Defendants argue that Dr. Ridpath's opinions as to Morton's athletic ability, or that an athlete as talented as Morton would overcome academic or other shortcomings to land a Division I or Division II athletic scholarship, are vague, generic, and speculative.

Dr. Ridpath's proffered testimony regarding Morton's athletic ability, his opinion that Morton's athletic ability would outweigh any academic shortcomings or procedural failures, and his opinion tying Morton's athletic abilities to the promise of an athletic scholarship (or a university or college's willingness to assist with, or look the other way on, Morton's academic or procedural requirements), all deserve exclusion under Rule 702 or, alternatively, under Rule 403. These opinions do not meet Rule 702's requirements that expert testimony be "based on sufficient facts or data," or that they are "the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702(b)-(d). Though Dr. Ridpath may have "personally [seen] dozens of athletes who had scores similar to Morton's that were able to attain full qualifier or partial qualifier status in accordance with NCAA initial academic eligibility benchmarks during their senior year," ECF NO. 148-1 Ex. 7 at 9, a matter on which he is qualified to testify, Dr. Ridpath has no experience with basketball or track and field from which he could reliably opine

13

how Morton's athletic ability would factor into this calculus. Dr. Ridpath's background is in coaching wrestling and general college sports administration, athlete eligibility, and compliance. Dr. Ridpath did nothing to educate himself on Morton's particular athletic potential, aside from reviewing Wilson's opinion and Morton's high school track records.[6] Thus, Dr. Ridpath has no personal experience from which he can conclude that Morton was so talented that his athletic abilities would overcome his academic and procedural shortcomings to obtain (and maintain) a Division I or Division II athletic scholarship. As such, Dr. Ridpath's opinion tying Morton's athletic ability to an athletic scholarship is speculative. In addition, there is a significant risk that a jury would give Dr. Ridpath's expert-cloaked opinion on Morton's athletic ability greater weight than it deserves. In other words, allowing Dr. Ridpath to testify on this issue would pose a substantial risk of unfair prejudice that substantially outweighs any marginal probative value of Dr. Ridpath's testimony. *See* Fed. R. Evid. 403.

Morton's arguments in defense of Dr. Ridpath's opinion on this issue are not persuasive. Morton cites a number of cases for the proposition that an expert need not have training or experience that "exactly matches" the facts or the issues about which he will testify. *See* ECF No. 182 at 6–7. Even if true in the abstract, those cases did not involve

---

[6] Defendants also seek to exclude Dr. Ridpath's allegedly incorrect statements about Morton having set "numerous personal and Mississippi State High School Records." *See* ECF No. 182 at 14, ECF No. 198 at 7–8. It is not clear how this information would remain relevant or admissible in light of the exclusion of Dr. Ridpath's "athletic ability" opinions. If it somehow proves relevant, and Defendants still believe that Dr. Ridpath has the facts wrong, Defendants can raise those issues on cross-examination during trial. *See Bonner*, 259 F.3d at 929.

an expert who failed to do the work to link what he generally knows about a topic to the specific facts of the case. *Cf. Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824. 829 (8th Cir. 2019) (finding district court acted within its discretion in admitting testimony of professional engineer "based on his experience and expertise in ladder investigations, general engineering principles, information from [the accident victim] about the accident, and his examination of the damaged ladder, its design and specifications, competitors' ladders, and photos of the accident scene" where he "provided a sufficient case-specific, factual basis to support his opinion"); *Furnituredealers.net, Inc., v. Amazon.com, Inc.*, No. 18-cv-232 (JRT/HB), 2002 WL 891462, at *16 (D. Minn. Mar. 25, 2022) (denying motion to exclude economist's expert opinions on Amazon's business model that were derived from a business model within his expertise); *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 569 (8th Cir. 1988) (affirming district court's decision to allow expert with "considerable academic and practical knowledge in the field of toxicology" to testify about plaintiff's injuries caused by exposure to certain chemicals even where expert admitted he had never done research in this specific area). Here, Dr. Ridpath has general expertise in collegiate athletic eligibility, compliance, and college sports administration. Dr. Ridpath has not tied this expertise to Morton's particular athletic ability or circumstances—he merely concludes that Morton was talented enough to overcome his poor academic record. And this is not just a gap in his knowledge; it is a matter of Dr. Ridpath lacking expertise (or knowledge gleaned from other sources, including Morton) to evaluate Morton's athletic ability in basketball or track and field, resulting in an inability to reliably opine on whether Morton

15

was talented enough to overcome the previously mentioned shortcomings to obtain a collegiate athletic scholarship.

2

Dr. Ridpath also offers an opinion about Park Christian School's potential as a private school to help Morton mitigate or overcome his academic and procedural shortcomings to prepare for college and a potential athletic scholarship. In particular, Dr. Ridpath states that "[s]chools like PCS that often recruit academically unprepared athletes are familiar with and well[-]equipped to provide the academic remediation necessary to assist as a way to better prepare them for college and a potential scholarship." ECF No. 148-1 Ex. 7 at 5.

This opinion, too, deserves exclusion. Though Dr. Ridpath has expertise in collegiate athlete eligibility and compliance, he offers no expertise in high school academic remediation. Even more significantly, Dr. Ridpath offers nothing to tie what he may generally know or believe about "private Christian-based schools" to Park Christian School. Dr. Ridpath acknowledges that he has no knowledge about Park Christian School's academic structure, or whether they even provide individualized education plans or people dedicated to such functions. ECF No. 148-1 Ex. 6 at 120. Any proffered opinion testimony about Park Christian School's "academic remediation" or college preparation for students seeking athletic scholarships would be speculative, unsupported by sufficient facts, and thus will be excluded.

3

Defendants also seek to exclude Dr. Ridpath's testimony that Morton was "recruited" by Park Christian School, arguing that this statement is not supported by the facts of the case.[7] On one hand, Dr. Ridpath's opinion about Morton being a "recruited" school athlete appears to raise the very kind of factual dispute that "goes to the credibility of the testimony, not the admissibility," leaving it "up to the opposing party to examine the factual basis for the opinion on cross-examination." *Bonner*, 259 F.3d at 929 (quotation omitted). But this is not just a question of whether Dr. Ridpath's testimony is disconnected from the facts of the case.

The bigger question is whether the testimony offers anything that would help the jury "to determine a fact in issue." Fed. R. Evid. 702(a). It would not. Dr. Ridpath's testimony that Morton was recruited by Park Christian School (and that high school recruitment reflects Morton's future athletic value and ability) appears to be an expert-cloaked way of saying that good athletes are more inclined to get an athletic scholarship. A typical juror would share this basic understanding of how things commonly work, and they do not need an expert to explain this concept. In addition, any marginal relevance of this testimony is outweighed by the risk of misleading the jury into believing that it has particular import, as well as the risk of wasting time with a side trial about whether Park Christian School recruited Morton. *See* Fed. R. Evid. 403. In other words, apart from Rule

---

[7]  For instance, Defendants point to Dr. Ridpath's deposition, during which he acknowledged that he "can't really say definitively" and "it appears to be a bit nebulous" who contacted Morton's mother about Park Christian School, in light of information later brought to his attention. *See* ECF No. 148-1 Ex. 6 at 49–50.

702, the admission of Dr. Ridpath's testimony that Park Christian School recruited Morton is not justified in view of its marginal relevance and the risks its admission would pose.

4

Dr. Ridpath also offers his opinion on "other potential paths to an athletic scholarship" that Morton may have taken had he continued to fall short of academic benchmarks. ECF No. 148-1 Ex. 7 at 9–11. Here, Defendants seek to exclude that portion of Dr. Ridpath's opinion that "it is possible Morton has an undiagnosed [certified learning disability] which could have been uncovered at [Park Christian School]" and possibly entitled Morton to an Initial Eligibility Waiver. *Id*. at 9–10.

This opinion is subject to exclusion for several reasons. First, Dr. Ridpath has no expertise with regard to learning disabilities. He does not possess background, education, or training in diagnosing learning disabilities. Dr. Ridpath testified that he is unaware of Jimmy Morton being diagnosed with a learning disability, and he acknowledged that he never has interviewed or spoken with Morton, so any learning-disability-related diagnosis would be speculative. ECF No. 148-1 Ex. 6 at 39, 74. Moreover, Dr. Ridpath's lack of personal experience with Park Christian School's procedures with regard to testing for learning disabilities—much less his lack of knowledge with the school's academic procedures as a whole—would render any opinion with regard to Park Christian School uncovering a learning disability wholly speculative. Dr. Ridpath will not be allowed to testify regarding the possibility of Morton having a learning disability.

5

Finally, Dr. Ridpath's proffered testimony regarding Morton's lost potential as an Olympic high jumper due to the June 2015 accident also deserves exclusion. This opinion raises the same concerns as Dr. Ridpath's opinions related to Morton's athletic ability, Morton's possible learning disability, or PCS's academic remediation—namely, Dr. Ridpath has no expertise with Olympic-level athletes or eligibility, and any opinion he could give would be speculative.

### ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Joint Motion to Exclude Expert Testimony of B. David Ridpath [ECF No. 145] is **GRANTED IN PART** and **DENIED IN PART** as moot as described herein.

Dated: November 22, 2022                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court